Opinion
 

 TURNER, P. J.
 

 I. Introduction
 

 Defendant, Martin Earl Dawson, appeals after he was convicted of first degree murder and second degree robbery. (Pen. Code, §§ 187, 211.
 
 [1]
 
 )Also, the jury found a principal in the commission of the offense was armed with a deadly weapon as to both counts. (§ 12022, subd. (d).) In the published
 
 *537
 
 portion of this opinion, we discuss whether the instructions given concerning the robbery felony-murder rule and aiding and abetting complied with the holding of
 
 People
 
 v.
 
 Prettyman
 
 (1996) 14 Cal.4th 248, 266-269 [58 Cal.Rptr.2d 827, 926 P.2d 1013]. We affirm.
 

 II. The Facts
 

 In this case, the prosecution theory was that defendant aided and abetted the person who had confessed to shooting the decedent, Sherry Lee Morgan. The evidence consisted of: substantial evidence that defendant was physically at the scene of the killing immediately prior to the time the decedent was shot to death; testimony by the confessed killer, Lawrence M., which was thoroughly impeached; defendant’s videotaped statement to detectives which like that of Lawrence M. was extensively impeached; and evidence of defendant’s participation as an aider and abettor in the robbery of a tuxedo shop in 1991. We set forth the relevant facts which include matters contained in the exhibits which have been transmitted pursuant to rule 10 of the California Rules of Court.
 

 A.
 
 Evidence Linking Defendant to the Scene of the Killing
 

 The decedent was the operator of a store called the Starlit Soiree which featured women’s fashion attire located on the second floor of a strip mall at 8950 Olympic Boulevard in Beverly Hills. It was her practice to clean the display cases at the store. On a daily basis, she would spray an all-purpose cleaner on the glass cabinets and wipe them clean. On the morning of December 7, 1994, the glass counters were cleaned by one of the decedent’s employees. The decedent wore a “rather unusual” and “conspicuous” diamond wedding ring. The ring consisted of a “rather large diamond ... set in a gold swirl pattern.”
 

 On December 7, 1994, the decedent was shot to death in her store sometime after 6 p.m. and her diamond wedding ring was stolen. Prior to 5:30 p.m., defendant was observed to be walking into the premises of the Starlit Soiree. Shortly after 5:30 p.m., defendant entered the store that adjoined the premises of the Starlit Soiree. When defendant entered, he had his hands in the pockets of his black jacket. The adjoining store on the second floor of the strip mall was called J. Rothstein and Company Jewelers. Defendant said, as he entered the store, “Diamonds, diamonds, I would like to see diamonds for my two-year-old daughter . . . .” Defendant was then asked, “[W]hat size?” Defendant was only interested in diamond earrings. Defendant was “a little nervous” and acted in a “peculiar” manner. An employee of the jewelry company noted that customers normally did not act
 
 *538
 
 as did defendant. Defendant remained in the jewelry store for approximately 10 minutes. He left the store between 5:30 and 5:45 p.m. without making a purchase. When he left the J. Rothstein and Company premises, defendant walked in the direction of the decedent’s store. By walking in that direction, defendant walked away from the elevator, which went to the first floor.
 

 Jamie Ko, who worked in another business on the second floor, entered the elevator at approximately 6 p.m. on December 7,1994. She saw a person fitting defendant’s description standing in the elevator. Moments later, she returned to the elevator and the person matching defendant’s description had not moved. The man matching defendant’s description was standing alone in an empty and closed elevator. She said to the man, “Are you still here[?]” The man did not respond.
 

 The decedent normally closed her store at 6 p.m. At 6:25 p.m., an employee of J. Rothstein and Company closed the jewelry store. As he was leaving, he noticed that the decedent had not closed up the front gates of her store. Also, the lights were still on. If the gates were open, that normally meant the decedent was still in her store. At 6:30 p.m., the decedent telephoned her husband. She said that she had a “late customer” but she was “closing now” or words to that effect. She stated to her husband that she would be home “in about 15 or 20 minutes.” The decedent’s husband indicated she “sounded in a hurry.”
 

 Officer Donald Pemesti of the Beverly Hills Police Department testified he arrived at the Starlit Soiree store at 7:47 p.m. on December 7, 1994. The front door was unlocked. The decedent was lying behind a counter. She had been shot through her right hand and the round entered her throat. The round had exited her body through the back of her neck. There were keys in her right hand and a can of mace was beneath her feet. Her diamond wedding ring was missing. The path of the shots was practically horizontal to the ground. During the investigation, an expended round was found in the area behind where the decedent was found lying on the floor. The location of the recovered round was consistent with it having been the bullet that caused the decedent’s death. Finally, defendant’s fingerprints were found on a glass counter near where the decedent was found.
 

 On December 29, 1994, defendant’s residence, apartment 4 at 325 West Hillcrest in Inglewood was searched. When the police arrived, both defendant and Lawrence M. were arrested after exiting the residence. When the residence was searched, a nine-millimeter handgun was recovered in a cupboard area. The expended round that appeared to have exited the back of the decedent’s neck was fired from the same nine-millimeter handgun found
 
 *539
 
 in the apartment occupied by defendant and Lawrence M. Additionally, during the search, some loose nine-millimeter ammunition was found next to defendant’s wallet. Moreover, a nine-millimeter magazine containing live rounds was found in the apartment. In a closet, a jacket similar to that worn by defendant on December 7, 1994, was found next to a safe.
 

 B.
 
 Lawrence M.’s Testimony and Statements
 

 As noted previously, an important part of the prosecution case was the testimony and impeachment of Lawrence M., who confessed to the killing of the decedent. Lawrence M. made written and oral statements, some of which were videotaped, to the police which on some but not all occasions exonerated defendant. As will be noted, Lawrence M.’s testimony was significantly impeached.
 

 1.
 
 The events prior to entering the store
 

 Lawrence M., who was 17 years old when he testified, had lived with defendant on December 7, 1994. Lawrence M. looked up to Mr. Dawson. Lawrence M. appreciated that Mr. Dawson provided a home. When Lawrence M. shot the decedent, he was 15 years old. Lawrence M. did not know why he was “interested" in the shopping center. He admitted he knew about the decedent’s wedding ring when he went to the store. He had been told about the wedding ring by a friend named Albert Theory when the two of them were in the presence of a “gang of people.” Lawrence M. claimed at one point during the trial that defendant was not present when Mr. Theory talked about the decedent’s ring. Later during the trial, Lawrence M. said he could not remember whether defendant was present when Mr. Theory discussed the decedent’s ring. In his written confession, Lawrence M. admitted defendant was present when Mr. Theory spoke about the decedent’s wedding ring.
 

 At trial, Lawrence M. claimed he was alone and shopping for earrings on the evening of December 7, 1994, when he entered the decedent’s store. Lawrence M. testified he did not know the location of the shopping center where the Starlit Soiree was located. Lawrence M. was asked why as a 15-year-old youth he entered the Beverly Hills store containing women’s high fashion apparel. He responded: “Why would you go into any store, it’s a female store. Maybe I wanted [t]o buy a gift for someone.” Lawrence M. claimed he would have been shopping for either his 23- or 29-year-old girlfriends although he was unable to identify their full names. At another point, Lawrence M. was unable to testify what he was shopping for when he entered the Starlit Soiree store. Lawrence M. later changed his testimony and
 
 *540
 
 stated he went to the store looking for the decedent. When interviewed by the police on December 29, 1994, Lawrence M. stated in his written confession he went to the shopping center for the purpose of committing an armed robbery of the decedent. At one point in his testimony, Lawrence M. denied entering any other stores in the center even though he was shopping. When confronted with the fact he did not enter any stores even though he was shopping, Lawrence M. admitted he entered a “Panda Express” fast-food establishment and purchased a hamburger.
 

 Lawrence M. was asked how he got from Inglewood to the store in Beverly Hills and he claimed he could not remember. Then he changed his testimony. Lawrence M. then admitted he was driven to the store by defendant. When asked why they ended up at the shopping center, Lawrence M. testified: “We was just driving around." Lawrence M. gave two versions of defendant’s conduct at the shopping center. The first version was that defendant never got out of his car. The second version described defendant getting out of his car at the shopping center and walking about. In his written confession, Lawrence M. stated that defendant had entered the store and saw the diamond ring. At trial, Lawrence M. denied defendant pointed out the store. In the written confession, Lawrence M. indicated defendant pointed out the Starlit Soiree store. After being advised the ring was on the decedent’s finger, in his written statement, Lawrence M. stated, “[Defendant] told me that he would wait around the comer.”
 

 2.
 
 Events inside the store
 

 Lawrence M. testified he entered the store. Lawrence M. waited to enter the store until there were no other customers present. Lawrence M. asked the decedent if the store was closing. When she responded in the affirmative, Lawrence M. asked for a business card. The decedent picked up a business card off of a counter. Lawrence M. then produced the nine-millimeter handgun recovered during the execution of the search warrant. The decedent said: “[Y]ou got to be kidding .... Get out of here.” Lawrence M. said, “[D]o you think it’s a joke?” The decedent then threatened to use mace on Lawrence M. Lawrence M. testified the decedent was laughing at him and reaching for “something.” Initially at trial, Lawrence M. denied she actually reached for the mace. However, in his written statement, Lawrence M. indicated she actually produced a canister of mace. After being confronted with his written statement, Lawrence M. then changed his testimony and admitted the decedent reached for mace. At trial, Lawrence M. testified that he did not show the decedent the bullets in the magazine for the handgun when she indicated she thought he was joking. However, in his written statement, Lawrence M. stated he showed her the bullets in an effort to
 
 *541
 
 encourage the decedent to cooperate. He then shot her as he backed onto a display case. Lawrence M. then picked up the ejected cartridge. He explained why he picked up the cartridge as follows, “Just a habit I got.” Lawrence M. then removed the ring from her finger. In his written statement, Lawrence M. claimed, “I didn’t know she was she was dead, I prayed God let her be alright.” In his videotaped confession, Lawrence M. claimed, “I kneeled down and say a prayer for her.” In his videotaped confession, Lawrence M. said he prayed “out loud.” At trial, Lawrence M. admitted he actually did not pray. When Lawrence M. left the store, the decedent was still breathing.
 

 3.
 
 Events after Lawrence M. left the store
 

 After shooting the decedent, Lawrence M. initially testified he ran from the store. In his written statement, Lawrence M. indicated he remained for one minute after the shooting and walked out of the store. Later during the trial, Lawrence M. changed his testimony and claimed he walked out of the store. Upon leaving the store, Lawrence M. began looking for defendant. Lawrence M. stated he had no reason to expect defendant to be anywhere around. After shooting the decedent, Lawrence M. claimed he ran two blocks and “caught up with” defendant. The decedent’s store was located near La Cienega. When asked the route from the Starlit Soiree to his sister’s place of employment, Lawrence M. only responded, “Sepulveda.” Lawrence M. did not know how far away his sister’s place of employment was from the Starlit Soiree.
 

 After entering the car, Lawrence M. began to cry. Lawrence M. admitted his written statement: Defendant asked what had happened; defendant was told Lawrence M. had shot the decedent; defendant asked, “ ‘Why did you do that?’ ”; defendant also asked, “ ‘If you ever want to talk about it, talk to me about it’ ”; and defendant said, “ ‘[T]ell me what happened because you wasn’t supposed to do that.’ ” Despite the fact Lawrence M. signed the written statement stating otherwise, during the trial, he denied telling the police defendant was informed in the car of the shooting. Additionally, Lawrence M. admitted in his videotaped confession defendant was informed of the shooting while the two were in the in the car leaving the shopping center. Defendant was not given the ring, according to Lawrence M.’s trial testimony. However, in his videotaped confession, Lawrence M. indicated defendant was given the ring. Later, the ring was returned by defendant to Lawrence M.
 

 At one point in his testimony, Lawrence M. stated his sister was in the car. Lawrence M. said the sister, Linda M., had been picked up from work by
 
 *542
 
 defendant. However, Lawrence M. changed his testimony and admitted his sister had not been working on December 7, 1994. In his written statement given after his arrest, Lawrence M. stated: “We then drove to Ross department Store, Sepulveda and National, and picked up my sister Linda [M.] from work.” Despite the fact Lawrence M. signed the written statement indicating differently, he denied telling the police he and defendant picked up Linda M. at the store at the comer of Sepulveda and National.
 

 Upon arriving at his residence in Inglewood, Lawrence M. hid the ring although he could not recall where. Lawrence M. claimed he later sold the ring for either $1,000 or $2,000. Lawrence M. did not know the actual name of the person who purchased the ring. The “nick name” used in the gang by the purchaser was Dougy. At various times when examined by the deputy district attorney, Lawrence M. refused to answer questions, particularly when they would incriminate defendant.
 

 C.
 
 Defendant’s Videotaped Statement
 

 As Lawrence M., defendant was interviewed by Beverly Hills Police Department investigators on December 29 and 30,1994. That interview was videotaped. As did Lawrence M., defendant gave highly contradictory statements during the various videotaped interviews. Defendant admitted he previously had been implicated as an accessory in the robbery of a tuxedo shop. He claimed the charges had been dismissed. Defendant stated he collected unemployment from a prior job but also was employed by a newspaper.
 

 Defendant stated he may have only been in Beverly Hills “maybe . . . once to twice.” When asked whether he had been in Beverly Hills within the last few months, defendant responded, “I really don’t know because I kind of got lost and ended up there.” He did note that he picked up Lawrence M.’s sister at “Ross on National and Sepulveda.” Defendant claimed the only store he had entered in Beverly Hills was “the Cartier store.” Defendant was advised that the comer of La Ciénega and Olympic was in the City of Beverly Hills. Defendant then indicated he had been at the comer of Olympic and La Cienega. After further prompting concerning the mall where the killing occurred, defendant said, “I’ve been in every shop in there.” However, defendant later changed his story and indicated he had not been in the chiropractor’s office in the mall. Defendant was able to describe many of the stores in the mall.
 

 Defendant knew there was a “[cjlothing store upstairs.” When confronted with some of the facts of the decedent’s death, defendant admitted, “I know
 
 *543
 
 which store you’re talking about.” Further, defendant was able to describe the decedent. When told the decedent had a “real nice diamond ring,” defendant responded, “I know anything about—yeah, okay.” Defendant then indicated, “The times I went there [Lawrence M.] was not with me.” Defendant then admitted he was in the store “that day.” He indicated he was in the store at 2 or 3 p.m. but did not speak to the decedent. He entered the store but “[n]obody came to the front.” He stated, “I was probably in there five minutes and nobody came to the front.” When interviewed the next day, defendant denied ever having been in the store where the killing occurred. He claimed only to have been to the mall on two occasions. Then he changed his story again and admitted to being in the store where the decedent was killed.
 

 Defendant was asked who could have brought Lawrence M. to the decedent’s store. Defendant responded with the name of Mr. Theory, who was in custody on December 7, 1994, the day of the homicide. Mr. Theory was involved in defendant’s 1991 robbery of a tuxedo shop. Defendant continued to suggest that his confederate in the 1991 robbery, Mr. Theory, could have been involved in the shooting of the decedent.
 

 Defendant was advised that a nine-millimeter handgun was found in his residence. Defendant denied owning the handgun although he admitted the loose bullets found in apartment were his. During the lengthy interview, defendant was advised as to the facts of the killing and Lawrence M.’s statement. A detective stated, “Nothing that we’ve told you is a lie, everything is a fact.” Defendant responded, “I believe it.”
 

 Finally, at the conclusion of the videotaped interview, defendant agreed to discuss the case further with detectives. Defendant stated, “I’ll tell you everything I know on Monday.” Also, defendant noted Lawrence M. admitted shooting the decedent. Therefore, defendant asked the detectives to assist him in securing “a O.R. or a house arrest later on.”
 

 D.
 
 The 1991 Tuxedo Shop Robbery
 

 On June 8, 1991, the operators of the Tuxedo King shop were robbed by defendant and Mr. Theory. Defendant and Mr. Theory waited until closing time. Eventually, the authorities were able to determine defendant’s identity. When interviewed by the police, defendant lied and claimed he left the store to get his driver’s license and did not participate in the robbery. He later identified Mr. Theory as a perpetrator. As a result of naming Mr. Theory, defendant received a sentence reduction.
 

 
 *544
 
 III. Discussion
 

 A.
 
 The Natural and Probable Consequences Doctrine
 

 Defendant argues that the trial court failed to instruct concerning the natural and probable consequences doctrine pursuant to CALJIC No. 3.02
 
 [2]
 
 as required by
 
 People
 
 v.
 
 Prettyman, supra,
 
 14 Cal.4th at pages 266-269. In
 
 Prettyman,
 
 the California Supreme Court addressed the issue of the instructions to be given in a case where the prosecution proceeded on a theory that the accused aided and abetted a crime and the person actually committing the offense ended up violating a different provision of the criminal law. The crime the parties intended to commit, as distinguished from the one ultimately perpetrated, was referred to as the “predicate or target offense[]” by the Supreme Court.
 
 (Id.
 
 at p. 263.) The Supreme Court described the natural and probable consequence theory as follows: “To apply the ‘natural and probable consequences’ doctrine to aiders and abettors is not an easy task. The jury must decide whether the defendant (1) with knowledge of the confederate’s unlawful purpose, and (2) with the intent of committing, encouraging, or facilitating the commission of any target crime(s), (3) aided, promoted, encouraged, or instigated the commission of the target crime(s); whether (4) the defendant’s confederate committed an offense
 
 other than
 
 the target crime(s); and whether (5) the offense committed by the confederate was a natural and probable consequence of the target crime(s) that the defendant encouraged or facilitated. Instructions describing each step in this process ensure proper application by the jury of the ‘natural and probable consequences’ doctrine.”
 
 (Id.
 
 at p. 267, original italics.)
 

 As a result, the court in
 
 Prettyman
 
 developed the following rule for instructing juries when the prosecution was relying on a theory an accused aided and abetted a target offense and the defendant’s confederate ended up actually committing a more serious crime: “But the sua sponte duty to instruct that is imposed here is quite limited. It arises only when the prosecution has elected to
 
 rely
 
 on the ‘natural and probable consequences’ theory of accomplice liability and the trial court has determined that thevidence will support instructions on that theory. The trial court, moreover,
 
 *545
 
 need not identify
 
 all
 
 potential target offenses supported by the evidence, but only those that the prosecution wishes the jury to consider. [f] The trial court should grant a prosecutor’s request that the jury be instructed on the ‘natural and probable consequences’ rule only when (1) the record contains substantial evidence that the defendant intended to encourage or assist a confederate in committing a target offense, and (2) the jury could reasonably find that the crime actually committed by the defendant’s confederate was a ‘natural and probable consequence’ of the specifically contemplated target offense. If this test is not satisfied, the instruction should not be given, even if specifically requested.”
 
 (People
 
 v.
 
 Prettyman, supra,
 
 14 Cal.4th at p. 269, original italics, fn. omitted.) The scope of the duty to instruct was described by the Supreme Court as follows: “We conclude that when the prosecutor relies on the ‘natural and probable consequences’ doctrine, the trial court must identify and describe the target crimes that the defendant might have assisted or encouraged. An instruction
 
 identifying
 
 target crimes will assist the jury in determining whether the crime charged was a natural and probable consequence of some other criminal act. And an instruction
 
 describing
 
 the target crimes will eliminate the risk that the jury will engage in uninformed speculation with regard to what types of conduct are criminal.”
 
 {Id.
 
 at p. 254, original italics.) Defendant argues that in this case the trial judge did not comply with this obligation.
 

 In the present case, the jury was not instructed pursuant to CALJIC No. 3.02. Rather, the jury was given felony-murder rule instructions which identified robbery as the underlying or target offense. The jurors were instructed pursuant to a modified version of CALJIC No. 8.10 as follows: “Defendant is accused in Count 1 of having committed the crime of murder, a violation of Penal Code section 187. [^Q Every person who unlawfully kills a human being during the commission or attempted commission of a robbery is guilty of the crime of murder in violation of section 187 of the Penal Code. [¶] In order to prove such crime, each of the following elements must be proved: Ffl] 1. A human being was killed. []D 2. The killing was unlawful, and [H 3. The killing occurred during the commission or attempted commission of a robbery.” Further, the target offense was identified when the jurors were instructed pursuant to a modified version of CALJIC No. 8.21, which stated: “The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs during the commission or attempted commission of the crime of robbery is murder of the first degree when the perpetrator had the specific intent to commit such crime. [H The specific intent to commit robbery and the commission or attempted commission of such crime must be proved beyond a reasonable doubt.” Moreover, the trial court gave complete general aiding and abetting instructions pursuant to a modified version of CALJIC No. 3.31, which stated in relevant part: “In the [crimes] charged in Counts 1 [and] 2 ... in connection with aiding and
 
 *546
 
 abetting . . . , there must exist a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator. Unless this specific intent exists the crime to which it relates is not committed. [jQ [The specific intent required is included in the definition[s] of the [crimes] set forth elsewhere in these instructions.]” Further, the trial judge instructed the jurors as to the requisite intent that must exist on defendant’s part in order for him to act as an aider and abettor pursuant to a modified version of CALJIC No. 8.27 in the following fashion: “If a human being is killed by any one of several persons engaged in the commission or attempted commission of the crime of robbery, all persons, who either directly and actively commit the act constituting that crime, or who with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, aid, promote, encourage, or instigate by act or advice its commission, are guilty of murder of the first degree, whether the killing is intentional, unintentional, or accidental.” Also, the jury was instructed pursuant to CALJIC No. 9.40 as to the elements of robbery including the specific intent requirement. CALJIC No. 9.40
 
 [3]
 
 was modified, though, to indicate that, “[¿jobbery is an element of the charge of murder in count 1.”
 

 The foregoing met all of the requirements imposed by
 
 Prettyman.
 
 The target offense, as the term is used in
 
 Prettyman,
 
 was robbery. It was identified and all of the relevant elements of the target crime and aiding and abetting liability were fully described. This met the requirements imposed by
 
 Prettyman. (People
 
 v.
 
 Prettyman, supra,
 
 14 Cal.4th at p. 254.) There was no requirement that CALJIC No. 3.02 also be read to the jury.
 
 [4]
 

 
 *547
 
 B.-D.*
 

 IV. Disposition
 

 The judgment is affirmed.
 

 Grignon, J., concurred.
 

 GODOY PEREZ, J., Dissenting.
 
 *
 

 A petition for a rehearing was denied January 20, 1998, and appellant’s petition for review by the Supreme Court was denied April 15, 1998.
 

 [1]
 

 All future statutory references are to the Penal Code.
 

 [2]
 

 CALJIC No. 3.02 states in pertinent part as follows: “One who aids and abets [another] in the commission of a crime [or crimes] is not onlj' guilty of [that crime] [those crimes], but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime[s] originally aided and abetted. Hfl In order to find the defendant guilty of the crime[s] of__ [as charged in Count[s]_,] you must be satisfied beyond a reasonable doubt that: [qj 1. The crime [or crimes] of_[was] [were] committed; [<]□ 2. That the defendant aided and abetted [that] [those] crime[s]; [U 3. That a co-principal in that crime committed the crime[s] of_; and [U (4) The crime[s] of_[was] [were] a natural and probable consequence of the commission of the crimefs] of__”
 

 [3]
 

 The modified version of CALJIC No. 9.40 given in this case was as follows: “Defendant is accused in Count 2 of having committed the crime of robbery, a violation of Section 211 of the Penal Code [and] robbery is an element of the charge of murder in count 1. [H Every person who takes personal property in the possession of another, against the will and from the person or immediate presence of that person, accomplished by means of force or fear and with the specific intent permanently to deprive such person of the property, is guilty of the crime of robbery in violation of Penal Code Section 211. [IQ ‘Immediate presence’ means an area within the alleged victim’s reach, observation or control, so that he or she could, if not overcome by violence or prevented by fear, retain possession of the subject property. [QQ In order to prove such crime, each of the following elements must be proved: [QQ 1. A person had possession of property of some value however slight, [1 2. Such property was taken from that person or from her immediate presence, [QQ 3. Such property was taken against the will of such person, [QQ 4. The taking was accomplished either by force or fear; and [QQ 5. Such property was taken with the specific intent permanently to deprive that person of the property.”
 

 [4]
 

 Given our holding that the instructions in this case met the requirements imposed by
 
 Prettyman,
 
 we need not address the issue of whether the natural and probable consequences doctrine is always applicable to the homicide element of the first degree felony-murder rule
 
 *547
 
 where the killing can be entirely accidental or the product of ordinary negligence. (Cf.
 
 People
 
 v.
 
 Prettyman, supra,
 
 14 Cal.4th at p. 266;
 
 People
 
 v.
 
 Balderas
 
 (1985) 41 Cal.3d 144, 197 [222 Cal.Rptr. 184, 711 P.2d 480].)
 

 *
 

 See footnote,
 
 ante,
 
 page 534.