[No. B149828. Second Dist., Div. Five. June 19, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
ART GONZALEZ, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, parts I, II, the indicated portions of part III.A., and IV are certified for publication. The concurring opinion of Associate Justice Richard M. Mosk is certified for publication.

COUNSEL

Kathy M. Chavez, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Kyle S. Brodie, and Lauren E. Dana, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**TURNER, P. J.—**

## I. INTRODUCTION

Defendant, Art Gonzalez, appeals from his first degree murder conviction. (Pen. Code,[1] § 187.) The jury further found defendant personally used a firearm in the commission of the murder. (§ 12022.5, subd. (a).) In the published portion of this opinion, we discuss the "quite limited" sua sponte duty to instruct on a target offense as it relates to a natural and probable consequences theory of aiding and abetting liability. (*People v. Prettyman* (1996) 14 Cal.4th 248, 269 [58 Cal.Rptr.2d 827, 926 P.2d 1013]; *People v. Dawson* (1997) 60 Cal.App.4th 534, 544 [71 Cal.Rptr.2d 33].) Defendant argues, for the first time on appeal, that the trial court should have instructed on its own initiative on the target offense of simple assault as a predicate for a finding that a prosecution witness was an accomplice on a natural and probable consequences aiding and abetting theory. Since the witness could have been viewed as an accomplice under a natural and probable consequences aiding and abetting theory, defendant reasons there was a sua sponte duty to instruct pursuant to CALJIC No. 3.02 and the elements of the target offense of simple assault. We disagree with the contention there was a sua sponte duty to so instruct concerning accomplice testimony and affirm the judgment.

## II. FACTUAL MATTERS

### A. *The Competing Theories*

The prosecution theory was that defendant personally shot and killed a rival gang member, Alfonso Ortega. An integral part of the prosecution case

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

was the testimony of defendant's fellow gang member, Mario Lopez. Mr. Lopez testified defendant fatally shot Mr. Ortega, the rival gang member. By contrast, defendant testified that Mr. Lopez murdered Mr. Ortega.

## B. *Prosecution Evidence*

The key prosecution witness was Mr. Lopez. Defendant and Mr. Lopez belonged to a gang that was the rival of another gang. Mr. Lopez was originally charged with the murder of the decedent, Alfonso Ortega. Mr. Lopez agreed to testify truthfully against defendant. As a result, Mr. Lopez would be permitted to plead guilty to voluntary manslaughter and receive an 11-year state prison sentence.

On May 10, 1997, defendant and Mr. Lopez were eating at a hamburger stand in south Los Angeles. Mr. Lopez did not have a gun in his possession. Mr. Lopez did not see defendant with a gun. Mr. Lopez did not know defendant had a gun. Mr. Ortega, a member of a rival gang, and a Black individual named Milbert Cyiark, came into the restaurant. Defendant and Mr. Lopez gave Mr. Ortega and Mr. Cyiark intimidating looks. Mr. Ortega returned the intimidating looks. Mr. Ortega and Mr. Cyiark left the hamburger stand. They walked to a nearby liquor store. Defendant and Mr. Lopez then walked outside the hamburger stand. Mr. Lopez was on his bicycle. Defendant was walking behind Mr. Lopez. Mr. Lopez believed a fight might occur. Mr. Lopez continued to ride his bicycle in the parking lot of an adjacent laundromat. Mr. Ortega and Mr. Cyiark approached a public telephone. According to Mr. Lopez, defendant appeared to be arguing with Mr. Ortega. Mr. Lopez had previously told defendant, "[H]it them up." Mr. Lopez testified that "hit them up" is a confrontational term which means to inquire about their neighborhood. Mr. Lopez heard a gunshot. Mr. Lopez saw defendant running with the gun. Mr. Lopez also saw Mr. Ortega on the ground and Mr. Cyiark near the door of the hamburger stand. Mr. Lopez took the gun from defendant. Mr. Lopez gave the bicycle to defendant. The two separated. Mr. Lopez took the gun to a fellow gang member named Anthony Delgado whose gang moniker was "Little Beaver."

Other witnesses confirmed Mr. Lopez's testimony. Angela Sepulveda was eating at the hamburger stand on May 10, 1997. She saw defendant and Mr. Lopez in the hamburger stand. She knew Mr. Lopez from school. Ms. Sepulveda saw Mr. Ortega and Mr. Cyiark enter the hamburger stand. Mr. Ortega exchanged acknowledgements with one another. Ms. Sepulveda believed the men were "mad dogging" one another. Thereafter Mr. Ortega and Mr. Cyiark left the hamburger stand. They walked toward the nearby liquor store. Defendant and Mr. Lopez put one fist on top of one another's fist and

then walked out of the hamburger stand. Mr. Lopez began riding his bicycle around the laundromat parking lot. Ms. Sepulveda heard a shot. Immediately thereafter, Mr. Cyiark ran into the hamburger stand. Mr. Cyiark said: "My homeboy got shot. My homeboy got shot. Call 9-1-1." Ms. Sepulveda saw defendant run across the street. Mr. Lopez rode his bicycle across the street. Ms. Sepulveda believed Mr. Lopez had continued to ride around in circles in the parking lot until he rode away. Ms. Sepulveda saw Mr. Ortega lying under the phone booth.

Juana Alcazar worked as a cashier at the hamburger stand on May 10, 1997. Ms. Alcazar saw defendant and a "Latin" man walk into the hamburger stand. They ordered food, ate inside the hamburger stand, then got up, and moved toward the exit. Ms. Alcazar did not see them leave. However, approximately three to five minutes later, she heard a gunshot. Thereafter, a Black man came into the hamburger stand. He asked to have his food quickly because, "A guy has been killed by the telephone." Ms. Alcazar followed him outside. Once outside, Ms. Alcazar saw the man who had been shot. Los Angeles County Deputy Sheriff Richard Lopez investigated Mr. Ortega's murder. In the course of that investigation, he showed a photographic lineup to Ms. Alcazar. Although Ms. Alcazar identified defendant as the individual who had been inside the hamburger stand just prior to the shooting, she refused to sign a photo identification form or statement. Ms. Alcazar was afraid to do so.

Jose Correa was driving past the hamburger stand on May 10, 1997. He saw three young individuals outside the hamburger stand. One individual was close to the pay phone. Two others appeared to be threatening the man next to the pay telephone. Defendant was one of the two men. The other man was small and shorter. Defendant raised his shirt as if he were showing something to the victim. Because the situation appeared ominous, Mr. Correa described what he did: "I decided to make a U-turn just in case something would happen, and if the young man would need some help." As he made the turn, Mr. Correa heard a gunshot. Defendant ran in front of Mr. Correa's car. Defendant was carrying a gun in his left hand. Mr. Correa saw a young man lying near the phone. Mr. Correa stopped his car. Mr. Correa's attempt to telephone for emergency assistance was unsuccessful. Mr. Correa went to help the young man. Mr. Correa directed others who had gathered to get towels. Mr. Correa also called the operator. Mr. Correa subsequently identified defendant's picture from a photographic lineup. Mr. Correa was 97 percent certain of his identification. Mr. Correa did not recall seeing a bicycle.

Mr. Lopez was arrested for drinking a few days after the shooting. He denied any involvement in the shooting. However, while in custody, a letter

written by Mr. Lopez to another gang member was intercepted by law enforcement officers. The letter, which described the killing of Mr. Ortega, identified defendant as the individual who fired the shots. The letter described the shooting of Mr. Ortega in great detail. The letter also indicated that "Little Beaver," the gang moniker used by Mr. Delgado, had been arrested with the gun after the shooting.

Mr. Delgado had been arrested on a weapons possession charge on May 12, 1997. Detective Lopez retrieved the gun from evidence in Mr. Delgado's case. A round fired from that gun was subsequently compared to the bullet removed from Mr. Ortega's head. The bullet appeared to be consistent with a small-caliber gun such as that in Mr. Delgado's possession. An autopsy revealed Mr. Ortega died of a bullet wound to the forehead, which lodged in his brain. Based upon the stippling around the entry wound, a pathologist concluded that the shot was fired from less than two feet from Mr. Ortega's forehead.

## C. *The Defense Case*

Defendant was the sole defense witness. Defendant admitted that he was a gang member and was eating at the hamburger stand on May 10, 1997. Defendant's fellow gang member, Mr. Lopez, was also eating at the hamburger stand. Mr. Ortega and Mr. Cyiark walked into the hamburger stand. Mr. Lopez began giving continuous dirty looks at Mr. Ortega. While seated at the hamburger stand, defendant did not direct any dirty looks towards Mr. Ortega or Mr. Cyiark. Shortly thereafter, Mr. Ortega and Mr. Cyiark left.

Mr. Lopez said to defendant, "What you want me to do?" Defendant testified as to his interpretation of that question as follows, "I thought it was, do we want to fight them one on one or do you want to jump them?" Defendant testified that he thought as a gang member it was his responsibility to engage in "fist fighting." Defendant indicated that fistfights were a common thing in his gang. In fact, defendant testified that he was "good at fist fighting." Defendant wanted to impress Mr. Lopez, who was an older gang member. Defendant responded, "I'll get down with him[.]" Defendant and Mr. Lopez then followed Mr. Ortega and Mr. Cyiark out of the hamburger stand. Defendant followed Mr. Ortega and Mr. Cyiark to a nearby liquor store. Defendant then used a pay phone to call a cousin.

Eventually, defendant called out, "Hey." Mr. Ortega then said, "What you want?" Defendant responded, "Where you from?" This, according to defendant, was a form of a challenge to a fistfight. Mr. Ortega responded by identifying his street gang. Mr. Ortega then made a disrespectful comment

about defendant's gang. Defendant answered: "What's up? Let's get down." Mr. Ortega responded: "For what? You guys ain't nothing." Defendant began stating, "What's up," as a prelude to a fistfight. As the two opposing gang members argued, Mr. Lopez said, "Get out of the way." Mr. Lopez then shot Mr. Ortega.

Mr. Lopez then handed the gun to defendant. Defendant said to Mr. Lopez, "Why did you do that for him[?]" Defendant then began running away from the scene of the shooting holding the gun that had been fired by Mr. Lopez. Defendant testified that he was shocked by what had occurred. As they were running, Mr. Lopez said to defendant, "Give me the gun." Defendant then went home. Defendant admitted that committing crimes was a way to "make a name for yourself" in his gang. Defendant never told police that Mr. Lopez shot Mr. Ortega.

## III. DISCUSSION

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .*

Prior to arguing to the jury, the prosecutor requested the standard shared-intent aiding and abetting instructions in CALJIC Nos. 3.00 and 3.01 set forth in the margin be given to the jury.[2] (See *People v. McCoy* (2001) 25 Cal.4th 1111, 1118 [108 Cal.Rptr.2d 188, 24 P.3d 1210]; *People v. Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318].) The deputy district attorney did not request the jury be instructed pursuant to CALJIC No. 3.02 on a natural and probable consequences aiding and abetting theory, including instructions of any target offenses. (See *People v. McCoy*, *supra*, 25 Cal.4th at p. 1117; *People v. Sakarias* (2000) 22 Cal.4th 596, 627-628 [94 Cal.Rptr.2d 17, 995 P.2d 152].) Additionally, the prosecutor requested that the jury be given accomplice instructions in connection with the testimony of Mr. Lopez. As can be noted from his testimony, Mr. Lopez, a fellow gang

---

*See footnote, *ante*, page 475.

[2]The jury was instructed as follows pursuant to a modified version of CALJIC No. 3.00: "Persons who are involved in committing a crime are referred to as principals in that crime. Each principal, regardless of the extent or manner of participation is equally guilty. Principals include: [¶] 1. Those who directly and actively commit the act constituting the crime, or [¶] 2. Those who aid and abet the commission of the crime." The jury also was instructed pursuant to a modified version of CALJIC No. 3.01 as follows: "A person aids and abets the [commission] [or] [attempted commission] of a crime when he or she, [¶] (1) With knowledge of the unlawful purpose of the perpetrator and [¶] (2) With the intent or purpose of committing or encouraging or facilitating the commission of the crime, and [¶] (3) By act or advice aids, promotes, encourages or instigates the commission of the crime. [¶] Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting. [¶] Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting."

member of defendant, was a *potential* accomplice in the fatal shooting of Mr. Ortega. Hence, the prosecutor requested, and the trial court gave, modified provisions of CALJIC Nos. 3.10, 3.11, 3.12, 3.14, 3.18, and 3.19.[3] The only request offered by defense counsel was that the jury should be instructed that the testimony of accomplice must be viewed with "distrust" rather than in compliance with CALJIC No. 3.18. The trial court instructed pursuant to CALJIC No. 3.18 as required by *People v. Guiuan* (1998) 18 Cal.4th 558, 564-570 [76 Cal.Rptr.2d 239, 957 P.2d 928], "To the extent an accomplice gives testimony that tends to incriminate the defendant, it should be viewed with caution." Defense counsel interposed no other objections and did not request any other modification to the standard accomplice instructions.

For the first time on appeal, defendant argues that the trial court failed to properly instruct the jury on accomplice liability as related to Mr. Lopez's testimony. Defendant argues as follows: "The trial court's failure to instruct on this doctrine prevented appellant's jury . . . from correctly

---

[3]The jurors were instructed in the following fashion pursuant to modified provisions of CALJIC Nos. 3.10, 3.11, 3.12, 3.14, 3.18, and 3.19: "An accomplice is a person who is subject to prosecution for the identical offense charged in Count One against the defendant on trial by reason of aiding and abetting. [¶] You cannot find a defendant guilty based upon the testimony of an accomplice unless that testimony is corroborated by other evidence which tends to connect the defendant with the commission of the offense. [¶] Testimony of an accomplice includes any out-of-court statement purportedly made by an accomplice received for the purpose of proving that what that accomplice stated out-of-court was true. [¶] To corroborate the testimony of an accomplice there must be evidence of some act or fact related to the crime which, if believed, by itself and without any aid, interpretation or direction from the testimony of the accomplice, tends to connect the defendant with the commission of the crime charged. [¶] However, it is not necessary that the evidence of corroboration be sufficient in itself to establish every element of the crime charged, or that it corroborate every fact to which the accomplice testifies. [¶] In determining whether an accomplice has been corroborated, you must first assume the testimony of the accomplice has been removed from the case. You must then determine whether there is any remaining evidence which tends to connect the defendant with the commission of the crime. [¶] If there is no independent evidence which tends to connect defendant with the commission of the crime, the testimony of the accomplice is not corroborated. [¶] If there is independent evidence which you believe, then the testimony of the accomplice is corroborated. [¶] Merely assenting to or aiding or assisting in the commission of a crime without knowledge of the unlawful purpose of the perpetrator and without the intent or purpose of committing, encouraging or facilitating the commission of the crime is not criminal. Thus a person who assents to, or aids, or assists in, the commission of a crime without that knowledge and without that intent or purpose is not an accomplice in the commission of the crime. [¶] To the extent an accomplice gives testimony that tends to incriminate the defendant, it should be viewed with caution. This does not mean, however, that you may arbitrarily disregard that testimony. You should give that testimony the weight you think it deserves after examining it with care and caution and in the light of all the evidence in the case. [¶] You must determine whether the witness Mario Lopez was an accomplice as I have defined that term. [¶] The defendant has the burden of proving by a preponderance of the evidence that Mario Lopez was an accomplice in the crime charged against the defendant." Additionally, the jury was instructed on the definition of preponderance of the evidence pursuant to CALJIC No. 2.50.2.

determining whether [Mr.] Lopez was an accomplice, and whether his testimony needed corroboration and whether his testimony should be viewed with caution. Had the jury been properly instructed, it would have deemed [Mr.] Lopez an accomplice if it found that he aided and abetted an assault on [Mr.] Ortega, and that the assault had homicide as its natural and probable consequence."

■ Typically, there is a sua sponte duty to give standard accomplice instructions. (*People v. Guiuan, supra,* 18 Cal.4th at pp. 564-565; *People v. Williams* (1988) 45 Cal.3d 1268, 1314 [248 Cal.Rptr. 834, 756 P.2d 221].) But when a standard accomplice instruction, such as a particular witness's testimony is to be viewed with distrust, is given without objection, a defendant cannot complain the instruction was too general or incomplete. In *People v. Guiuan, supra,* 18 Cal.4th at page 570, the Supreme Court held: "Guiuan did not object. Neither did she request modification. She may not be heard now. 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' (*People* v. *Andrews* (1989) 49 Cal.3d 200, 218 [260 Cal.Rptr. 583, 776 P.2d 285].)" Nor is there a sua sponte duty to modify the standard instruction on corroboration to indicate it applies to both in and out-of-court statements of the potential accomplice. (*People v. Andrews, supra,* 49 Cal.3d at pp. 217-218.)

In order for the jury to be properly instructed under defendant's theory, the trial court would be required, on its own initiative, to give an instruction along the lines of CALJIC No. 3.02.[4] ■ The Supreme Court described the natural and probable consequences doctrine as applied to aiders and

---

[4]The 2000 re-revision of CALJIC No. 3.02 states: "One who aids and abets [another] in the commission of a crime [or crimes] is not only guilty of [that crime] [those crimes], but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime[s] originally aided and abetted. [¶ In order to find the defendant guilty of the crime[s] of _____, [as charged in Count[s] _____,] you must be satisfied beyond a reasonable doubt that: [¶] 1. The crime [or crimes] of _____ [was] [were] committed; [¶] 2. That the defendant aided and abetted [that] [those] crime[s]; [¶] 3. That a co-principal in that crime committed the crime[s] of _____; and [¶] 4. The crime[s] of _____ [was] [were] a natural and probable consequence of the commission of the crime[s] of _____. [¶] [You are not required to unanimously agree as to which originally contemplated crime the defendant aided and abetted, so long as you are satisfied beyond a reasonable doubt and unanimously agree that the defendant aided and abetted the commission of an identified and defined target crime and that the crime of [charged crime] was a natural and probable consequence of the commission of that target crime.] [¶] [Whether a consequence is 'natural and probable' is an objective test based not on what the defendant actually intended but on what a person of reasonable and ordinary prudence would have expected would be likely to occur. The issue is to be decided in light of all of the circumstances surrounding the incident. A 'natural consequence' is one which is within the normal range of outcomes that may be

abettors as follows in *People v. Prettyman, supra,* 14 Cal.4th 248 at page 267: "To apply the 'natural and probable consequences' doctrine to aiders and abettors is not an easy task. The jury must decide whether the defendant (1) with knowledge of the confederate's unlawful purpose, and (2) with the intent of committing, encouraging, or facilitating the commission of any target crime(s), (3) aided, promoted, encouraged, or instigated the commission of the target crime(s); whether (4) the defendant's confederate committed an offense *other than* the target crime(s); and whether (5) the offense committed by the confederate was a natural and probable consequence of the target crime(s) that the defendant encouraged or facilitated. Instructions describing each step in this process ensure proper application by the jury of the 'natural and probable consequences' doctrine." (Original italics; see *People v. Dawson, supra,* 60 Cal.App.4th at p. 544.) As can be noted, inherent in the natural and probable consequences rule is the requirement the jury be instructed on target offenses. (*People v. Sakarias, supra,* 22 Cal.4th at pp. 627-628; *People v. Gonzales* (2001) 87 Cal.App.4th 1, 8-9 [104 Cal.Rptr.2d 247].) In this case, defendant argues that a simple assault could have been the target offense. Intrinsic in defendant's contention is that the accomplice testimony instructions should have been augmented with CALJIC No. 3.02 and a requirement that the jury should have been instructed, without request by any party, on the target offense of simple assault.

However, the California Supreme Court has explicitly held that there is no sua sponte duty to instruct on target offenses in the context of prosecution based in part upon a natural and probable consequences aiding and abetting theory. In *People v. Prettyman, supra,* 14 Cal.4th at page 269, the Supreme Court set forth the "quite limited" circumstances under which the sua sponte duty to instruct on target offenses as follows: "We recognize that the workload of our already heavily burdened trial courts is increased whenever we impose on trial judges an obligation to provide a particular jury instruction sua sponte. We also recognize that 'the trial court cannot be required to anticipate every possible theory that may fit the facts of the case before it and instruct the jury accordingly.' (*People v. Wade* (1959) 53 Cal.2d 322, 334 [1 Cal.Rptr. 683, 348 P.2d 116].) But the sua sponte duty to instruct that is imposed here is quite limited. It arises only when the prosecution has elected to *rely* on the 'natural and probable consequences' theory of accomplice liability and the trial court has determined that the evidence will support instructions on that theory. The trial court, moreover, need not

---

reasonably expected to occur if nothing unusual has intervened. 'Probable' means likely to happen.]"

identify *all* potential target offenses supported by the evidence, but only those that the prosecution wishes the jury to consider. [¶] The trial court should grant a prosecutor's request that the jury be instructed on the 'natural and probable consequences' rule only when (1) the record contains substantial evidence that the defendant intended to encourage or assist a confederate in committing a target offense, and (2) the jury could reasonably find that the crime actually committed by the defendant's confederate was a 'natural and probable consequence' of the specifically contemplated target offense. If this test is not satisfied, the instruction should not be given, even if specifically requested." (Fn. omitted, original italics; see *People v. Dawson, supra*, 60 Cal.App.4th at p. 544.) The omitted footnote in *Prettyman* states, "If the prosecutor requests that the jury be instructed on the 'natural and probable consequences' doctrine, but fails to identify potential target crimes, the trial court should inquire about the particular target offenses on which instruction is desired." (*People v. Prettyman, supra*, 14 Cal.4th at p. 269, fn. 9.) Quite obviously, there is no sua sponte duty to give instructions on target offenses unless the prosecutor relies on a natural and probable consequences theory. If the prosecutor fails to identify any potential target crimes, then no instruction may be given pursuant to CALJIC No. 3.02 on a natural and probable consequences aiding and abetting theory.

No doubt, *Prettyman* involves instructions on the liability of a charged offense—murder. (*People v. Prettyman, supra*, 14 Cal.4th at p. 254.) Defendant attempts to distinguish *Prettyman*, which concludes no sua sponte duty existed under the circumstances, by arguing that the present case involves a potential target offense which relates to possible aiding and abetting liability and cautionary accomplice testimony instructions. But we fail to distinguish any meaningful difference between this case and holding in *Prettyman* as to the "quite limited" sua sponte duty to instruct on a target offense. (*Id.* at p. 269; *People v. Dawson, supra*, 60 Cal.App.4th at p. 544.) If there is no sua sponte duty to instruct on target offenses as it relates to an element of charged crime, then no justification in reason or law warrants imposing such a responsibility on a trial court to act on its own initiative in connection with accomplice testimony. We have already detailed the exceptions to the sua sponte duty to instruct on accomplice testimony in *People v. Guiuan, supra*, 18 Cal.4th at page 570, and *People v. Andrews, supra*, 49 Cal.3d at page 218. Instructing on a target offense to support a CALJIC No. 3.02 natural and probable consequences aiding and abetting theory as a basis for potential accomplice liability falls within the scope of an exception to the normal sua sponte obligation to instruct in this area just as *Guiuan* and *Andrews* recognize no duty to instruct on the trial court's own motion concerning testimony by an accused's confederate exists in other respects.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .*

## IV. Disposition

The judgment is affirmed.

Grignon, J., concurred.

**MOSK, J.**—I concur in the result. I believe that the trial court erred by not giving the CALJIC No. 3.02 instruction concerning liability for natural and probable consequences for purposes of determining whether a witness was an accomplice, but that the error was harmless.

Because the jury was not instructed with CALJIC 3.02, the jury could have found that Mario Lopez (Lopez) was an accomplice only if it found that he knew of and intended to further defendant's unlawful purpose, i.e., murder. That is not a complete statement of accomplice law. Lopez also could have been found to be an accomplice if he aided and abetted a crime—here assault—(a "target offense"), the natural and probable consequence of which was murder. (See generally *People v. Prettyman* (1996) 14 Cal.4th 248, 259-263 [58 Cal.Rptr.2d 827, 926 P.2d 1013].)

If the jury had been instructed with CALJIC No. 3.02, then the jury could have found that Lopez was an accomplice even if it believed he did not know that defendant intended to shoot the victim. (*People v. Gonzales* (2001) 87 Cal.App.4th 1 [104 Cal.Rptr.2d 247].) If Lopez engaged in a criminal act, the natural and probable consequence of which was murder, then he was an accomplice, and his testimony required corroboration and had to be viewed with distrust.

*Prettyman* and its requirement that the prosecution rely on the target offense as a prerequisite to the duty to instruct on that offense is not applicable here in determining whether the trial court had a sua sponte duty to instruct the jury on natural and probable consequences. *Prettyman* concerns the sua sponte duty to instruct on target offenses relevant to the natural and probable consequences principle in connection with the prosecution of a *defendant* pursuant to that principle. (*People v. Prettyman, supra,* 14 Cal.4th at p. 269.) The *Prettyman* discussion is not determinative with regard to an accomplice instruction.

Although I agree that appellate courts should "avoid loading yet another sua sponte instructional duty on trial courts" (*People v. Prettyman, supra,* 14 Cal.4th at p. 278 (conc. opn. of Mosk, J.)), the duty I find here has already

---

*See footnote, *ante,* page 475.

been established. When there is sufficient evidence that a witness is an accomplice, the trial court is required on its own motion to instruct the jury on the principles governing the law of accomplices. (*People v. Frye* (1998) 18 Cal.4th 894, 965-966 [77 Cal.Rptr.2d 25, 959 P.2d 183]; *People v. Gordon* (1973) 10 Cal.3d 460, 469-470 [110 Cal.Rptr. 906, 516 P.2d 298].) When there is evidence that a witness—rather than acting as a direct aider and abettor—aided and abetted a target offense, the natural and probable consequence of which is the charged crime, the law of accomplices necessarily requires the jury to be so instructed. The trial court erred by failing to give the CALJIC No. 3.02 instruction because the instruction, in this case, is part of the law of accomplices, not because the instruction was required by *Prettyman* in connection with the accomplice liability of a defendant.

A conviction will not be reversed for failure to instruct on these principles if a review of the entire record reveals sufficient evidence of corroboration. (*People v. Frye, supra,* 18 Cal.4th at p. 966; *People v. Arias* (1996) 13 Cal.4th 92, 143 [51 Cal.Rptr.2d 770, 913 P.2d 980].) Corroboration need only be slight. (*People v. Fauber* (1992) 2 Cal.4th 792, 835 [9 Cal.Rptr.2d 24, 831 P.2d 249].) "It [the evidence] need not corroborate every fact to which the accomplice testified or establish the corpus delicti, but is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth." (*Id.* at p. 834; see also Pen. Code, § 1111.)

Here, the error was harmless because Lopez's testimony was independently corroborated. Among other evidence, Jose Correa testified that he saw defendant lift his shirt as if showing something to the victim, and he thereafter heard a gunshot and saw defendant running with a gun in his hand. Hence, any error in failing to instruct the jury on the natural and probable consequences doctrine was harmless.

Appellant's petition for review by the Supreme Court was denied September 11, 2002. Kennard, J., was of the opinion that the petition should be granted.