[No. B147879. Second Dist., Div. Five. June 24, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
QUAN LE HUYNH, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of the indicated portions of part IV.A., the heading for part IV.B., and part IV.C. in its entirety. The indicated portion of the dissent is to be published.

## COUNSEL

Kathy M. Chavez, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Robert F. Katz and Michael R. Johnson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**TURNER, P. J.—**

### I. INTRODUCTION

Defendant, Quan Le Huynh, appeals from his convictions for second degree murder (Pen. Code, § 187)[1] and shooting at an inhabited automobile. (§ 246.) Defendant contends that evidence was erroneously presented to the jury and there was instructional error. In the published portion of this opinion, we address the question of whether the trial court has a sua sponte duty to instruct on a misdemeanor target offense, not identified by the prosecutor, which would support an involuntary manslaughter verdict in a case where the deputy district attorney relies on an implied malice crime second degree murder natural and probable consequences aiding and abetting theory. Because, as will be noted, the Supreme Court held in *People v. Prettyman* (1996) 14 Cal.4th 248, 269 [58 Cal.Rptr.2d 827, 926 P.2d 1013], there is no sua sponte duty to instruct on a target offense not identified by a prosecutor, we reject defendant's contention to the contrary. We affirm the judgment of conviction and sentence. But we order the abstract of judgment corrected to reflect that defendant has been convicted of second degree murder.

### II. PROCEDURAL HISTORY

Defendant was originally charged in an amended information filed February 28, 2000, with eight felony counts. In count 1, defendant was charged

---

[1] Unless otherwise noted, all future statutory references are to the Penal Code.

with the murder of Minh Nguyen. Additionally, it was alleged: the murder occurred by discharging a firearm from an automobile within the meaning of section 190, subdivision (a)(2); defendant personally discharged a firearm which caused Mr. Nguyen's death within the meaning of section 12022.53, subdivision (d); defendant personally discharged a firearm within the meaning of section 12022.53, subdivision (c); defendant personally used a firearm within the provisions of sections 12022.5, subdivision (a)(1) and 12022.53, subdivision (b); a principal intentionally discharged a firearm pursuant to section 12022.53, subdivisions (d) and (e)(1); a principal personally discharged a firearm within the meaning of section 12022.53, subdivisions (c) and (e)(1); and a principal personally used a firearm within the meaning of section 12022.5, subdivision (a)(1) and section 12022.53 subdivisions (b) and (e)(1).

In count 2, defendant was charged with the attempted willful, deliberate, and premeditated murder of David Tran. (§§ 187, subd. (a), 664, subd. (a).) Additionally, it was alleged: defendant personally used and intentionally discharged a firearm within the meaning of section 12022.53, subdivision (d); defendant personally used and intentionally discharged a firearm within the meaning of section 12022.53, subdivision (c); defendant personally used a firearm within the provisions of sections 12022.5, subdivision (a)(1) and 12022.53, subdivision (b); a principal intentionally discharged a firearm pursuant to section 12022.53, subdivisions (d) and (e)(1); a principal intentionally and personally discharged a firearm within the meaning of section 12022.53, subdivisions (c) and (e)(1); and a principal personally used a firearm within the meaning of section 12022.5, subdivision (a)(1).[2]

In count 3, defendant was charged with the attempted willful, deliberate, and premeditated murder of Andrew Vongkavivathanakul. (§§ 187, subd. (a), 664, subd. (a).) In count 4, defendant was charged with the attempted willful, deliberate, and premeditated murder of Vincent Vongkavivatha-nakul.[3] (§§ 187, subd. (a), 664, subd. (a).) It was alleged in counts 3 and 4: defendant personally used and intentionally discharged a firearm within the meaning of section 12022.53, subdivision (c); defendant personally used and intentionally discharged a firearm within the meaning of section 12022.53, subdivision (b); defendant personally used a firearm within the provisions of section 12022.5, subdivision (a)(1); a principal intentionally and personally discharged a firearm within the meaning of section 12022.53, subdivisions (c) and (e)(1); and a principal personally used a firearm within the meaning of section 12022.53, subdivisions (b) and (e)(1).

---

[2]We recognize that section 12022.5, subdivision (a)(1) does not apply when a person other than the accused fires a gun. We are reciting only what the amended information alleged.

[3]For purposes of clarity and not out of any disrespect to the Vongkavivathanakuls, they will be separately referred to hereafter as Andrew and Vincent.

In count 5, defendant was charged with shooting at an occupied vehicle. (§ 246.) In count 6, defendant was charged with assault by means likely to produce great bodily injury on Andrew within the meaning of section 245, subdivision (a)(1). In count 7, defendant was charged with assault by means likely to produce great bodily injury on Vincent within the meaning of section 245, subdivision (a)(1). In count 8, defendant was charged with possession of a firearm by a convicted felony. (§ 12021, subd. (a)(1).) As to counts 1 through 8, it was alleged that the offenses were committed for the benefit of a street gang. (§ 186.22, subd. (b)(1).)

On November 3, 2000, the jury returned its verdicts. As to count 1, the killing of Mr. Nguyen, defendant was convicted of second degree murder. As to count 5, defendant was convicted of shooting at an occupied automobile. As to all other counts, defendant was acquitted. All special allegations were found to be not true.

## III. FACTUAL MATTERS

### A. *The Competing Theories*

The prosecution theory was that defendant shot Mr. Nguyen. The shooting occurred on a freeway after a fight erupted in a Hollywood nightclub parking lot. The prosecution contended that the shooting arose out of defendant's longtime membership in an Asian street gang. By contrast, defendant's theory was that Max Khaolaeiad shot Mr. Nguyen. Defendant admitted being in the car when Mr. Khaolaeiad shot Mr. Nguyen and the incident occurred after the conclusion of the nightclub parking lot fight. Defendant testified Mr. Khaolaeiad unexpectedly fired the shots. Under the defense theory, at the time of the shooting, defendant planned to throw a bottle at the car carrying Mr. Nguyen forcing it off the side of the road. Thereupon, defendant intended to use a metal steering wheel security device, commonly called the Club, to attack the occupants of the car in which Mr. Nguyen was riding. The attack on the car in which Mr. Nguyen was a passenger was to be accomplished by all four occupants of defendant's black Acura Sebring. As noted previously, defendant was convicted of second degree murder and discharging a firearm at a car.

### B. *The Gang Evidence*

There was conflicting evidence as to defendant's membership in an Asian street gang and its role in the shooting of Mr. Nguyen. Detective Mark Nye of the Westminster Police Department testified concerning Asian street gangs generally. Unlike other ethnic groups, Asian street gang members

come from affluent and educated families and do not claim a "turf." However, according to Detective Nye, Asian gangs require a member to be "jumped in." This meant the potential member was to be beaten by his future fellow gang members. Similarly, when leaving the gang, the member was subjected to a "jumping out" ceremony. Detective Nye believed that respect, i.e., face, is "no. 1 for" Asian street gangs. For gangs, respect is gained by violence.

Detective Nye also testified concerning defendant's street gang. It was the result of the fusion of other Asian gangs. Defendant's gang began forming in 1991 in the cities of Westminster and Huntington Beach. Defendant's gang had its own tattoo and graffiti. Defendant was mentioned in letters written by other gang members. Defendant also appeared in photographs with other gang members. Young men of Vietnamese descent dominated defendant's gang.

On January 7, 2000, Johnny Hung Nguyen,[4] a member of defendant's gang, was convicted of attempted murder. Additionally, Johnny admitted he used a deadly weapon and the crime was committed for benefit of or at the direction of a street gang. In Detective Nye's opinion, the attempted murder was committed to further the purposes of defendant's gang. Johnny was a founding member of defendant's gang. Detective Nye was permitted to offer an opinion concerning the shooting in the present case. Detective Nye believed the shooting in the present case was designed to benefit the gang.

Defendant testified concerning his past participation in gang activities. Defendant admitted the group he associated with saw themselves at one time as a gang. Defendant admitted becoming a member in 1994 of the gang identified by Detective Nye. Defendant explained his involvement in the gang as follows: "[It] is not a gang, this is our group of friends. We like to party, . . . we don't jump in people, we don't do things like gangs, but then some of us took it to another level, including myself. [¶] . . . [W]e start thinking we're bad, this is a gang, let's make this . . . a gang." Defendant took his involvement at one time in the gang very "seriously." Thereafter, defendant became involved in gang-related fights. Weapons were used in some of the fights. Defendant's gang moniker was "Youngsta." Defendant used his gang moniker even after he left the gang in 1998. Defendant admitted writing letters referring to the gang. The gang had been involved in fights and used firearms during some of those altercations. Some of the gang members had tattoos. By 1998, after being paroled on a firearms possession violation, defendant testified he left the gang. However, defendant admitted

---

[4]Because the homicide victim in the present case also has the surname of Nguyen, for purposes of clarity, Johnny Hung Nguyen will be referred to as Johnny.

using his gang moniker, Youngsta, even after he was paroled. Defendant identified letters he had written containing references to gangs. One letter expressed a desire to "187" members of rival gangs. Defendant also did research on Asian gangs on his computer. He testified he did the research for a paper he wrote in a business writing class he was taking.

Other witnesses gave varying testimony on the gang enhancement issue. Thaun Dang denied the group identified by Detective Nye and defendant was a gang. Mr. Dang believed the group "pretty much" would "party, drink, [and] have a good time." Defendant specifically disagreed with this characterization of the gang by Mr. Dang. Nando Sisowath testified the group identified by Detective Nye was not a street gang. But in 1995, Mr. Sisowath admitted he was a member of the gang. A Fountain Valley Police Department detective believed defendant was a gang member in 1999. Sheryl Nguyen testified that defendant was not gang member. In fact, Ms. Nguyen, a friend of defendant, denied even knowing any members of the gang. However, in a videotaped statement played to the jury, Ms. Nguyen stated defendant was "for sure" a member of the gang. Further, Mr. Khaolaeiad testified defendant was a member of the gang. Mr. Khaolaeiad admitted he was member of the gang. The "shot caller" or head of the gang was Johnny.

### C. The Testimony of Witnesses Other Than Defendant

#### 1. Testimony concerning the fight at the Hollywood nightclub parking lot

On Thursday evening, January 14, 1999, Vincent, accompanied by Andrew, Mr. Tran, and Mr. Nguyen, went to the Arena Club in Hollywood. Thursday evening was Asian night at the Arena Club. Vincent drove his red Honda Civic and parked around 10 p.m. in a nearby parking lot. Vincent, Andrew, Mr. Tran, and Mr. Nguyen left the Arena Club around 2:00 a.m. Mr. Tran and Mr. Nguyen walked to a nearby convenience store while Vincent and Andrew walked back to the red Honda Civic. Parked next to Vincent's red Honda Civic was a car containing one Caucasian and two Asian women. Ms. Nguyen, a friend of defendant, testified she and some friends were parked next to Vincent's red Honda Civic. The car, a plum or brown Acura Integra, belonged to Angela Castorena. Accompanying Ms. Nguyen were Mylan Vo, Tina Trang, and Ms. Castorena. Vincent briefly spoke to one of the women. Ms. Nguyen testified she spoke to one of the men in the red Honda Civic. Ms. Nguyen characterized the conversation as "just joking around."

As he was backing out of his parking space after 2:00 a.m., Vincent heard a car horn sound. An argument ensued and Andrew, while still seated in his

red Honda Civic, was hit in the face. Andrew got out of his red Honda Civic where he was attacked by a large number of people. Eventually, the fight was broken up by "security." Prior to the commencement of the fight, no gang names were called out, as would often be the case. Vincent testified: "[T]hey were acting . . . just like gang . . . like if you fight one person in a gang, you're going to fight the rest, and that's how they're acting. And usually gangs when they put in work or they do something like that . . . they call out their name."

There was conflicting testimony concerning who attacked Andrew. For example, Vincent testified defendant started the fight. Also, prior to trial, Andrew identified defendant as the person who started the fight in the parking lot. But at trial, Andrew could not testify defendant was even involved in the parking lot fight. Charles DeWinter, a private security officer who helped stop the brawl, testified defendant was not the individual punching Vincent through the window of the red Honda Civic. Ms. Nguyen, a friend of defendant, testified Tony Pham was the person who hit Vincent. Mr. Khaolaeiad identified Mr. Pham as striking Vincent through the open driver's side window of the red Honda Civic.

### 2.  *Testimony concerning the freeway shooting*

After the fight, Vincent and Andrew drove to a nearby convenience store where they picked up Mr. Nguyen and Mr. Tran. At the same time, Ms. Castorena drove her Acura Integra to the same convenience store. In the plum or brown colored Acura Integra, Ms. Nguyen was in the front passenger seat. Ms. Trang was in the backseat. Ms. Nguyen testified that she saw Vincent and Andrew in the convenience store parking lot. Ms. Nguyen described what occurred as follows, "They were yelling and screaming some stuff that they were from Burbank, and if we wanted trouble to go down to Burbank and handle it or something." Ms. Nguyen testified, "They threw a water bottle at our car." Vincent admitted that there was an argument with the women in the plum or brown colored Acura Integra. But Vincent denied that either he or any of his friends threw a water bottle at the plum or brown colored Acura Integra.

Vincent then drove his red Honda Civic on to a nearby freeway. Vincent was the driver while Andrew was in the front passenger seat. Mr. Tran was in the right rear passenger seat. Mr. Nguyen was in the left rear passenger seat. While on the freeway, Andrew saw the plum or brown colored Acura Integra driven by Ms. Castorena. Vincent slowed down his red Honda Civic. Vincent was about to pass the plum or brown colored Acura Integra. Andrew wrote down the license plate number of the plum or brown colored Acura

Integra. Vincent testified: "After we had got the license plate, I backed off because I didn't want to have anything to do with them. . . . I didn't want them to have my license plate number or anything, so I just backed off." Vincent then slowed down his red Honda Civic and backed away from the plum or brown colored Acura Integra.

The occupants of the plum or brown colored Acura Integra had a different perspective on what transpired. Ms. Nguyen testified the men in the red Honda Civic followed the three women in the plum or brown colored Acura Integra for 10 minutes on various freeways. Ms. Nguyen was afraid, as was Ms. Castorena. Ms. Nguyen had her cell phone. Ms. Trang used that telephone to make a number of telephone calls.

One minute after Andrew wrote down the license plate number of the plum or brown colored Acura Integra, Mr. Nguyen said: "Hey, there's a car coming up—there's a car pulling up really fast. Do you know these guys?" All of the sudden gunshots rang out from the right rear side of the black Acura sedan. Both Mr. Tran and Mr. Nguyen were hit by the gunshots. The occupants of the plum or brown colored Acura Integra did not see the shooting.

### 3. *Mr. Khaolaeiad's testimony*

Mr. Khaolaeiad testified to being present in the car from which the shots were fired by defendant which killed Mr. Nguyen during the early morning hours of January 15, 1999. At 10:00 p.m. on January 14, 1999, Mr. Khaolaeiad met some friends at the Arena Club in Hollywood. Defendant was one of those with whom Mr. Khaolaeiad met at the nightclub. Upon leaving, two of his friends became involved in a fight with the occupants of a red Honda Civic.

Mr. Khaolaeiad got into defendant's car, a black Acura sedan. Driving the car was Tan Vu who was not a gang member. Mr. Khaolaeiad was seated in the left backseat of defendant's black sedan. Seated next to Mr. Khaolaeiad was Sally Saeidi. Defendant was seated in the right front passenger seat. In defendant's car was a handgun he kept in a compartment in the dashboard behind the radio.

After leaving the parking lot, Mr. Vu drove defendant's black Acura sedan to a gas station. The purpose of stopping at the gas station was to meet up with "the girls" whom Mr. Khaolaeiad had seen at the club. Defendant received a telephone call on his cell phone from "[t]he girls." Mr. Khaolaeiad described the call as follows: "That the people that they got into the fight

with in the red Civic were following the girls." Mr. Vu drove defendant's black sedan onto a nearby freeway. Defendant continued to talk on the telephone. Mr. Khaolaeiad described defendant's side of the conversation as follows: "Where are they at? What exit are you guys at now? What are they saying to you?" At another point, Mr. Khaolaeiad heard defendant say, "Just let them follow you for a little bit." Prior to the shooting, Mr. Khaolaeiad picked up the Club to use in case there was a fight with the occupants of the red Honda. When defendant picked up the gun, Mr. Khaolaeiad put the Club on the floor.

The occupants of defendant's black sedan then saw the red Honda Civic. Mr. Khaolaeiad could not tell how many people were in the red Honda Civic because the windows were tinted. Defendant then rolled down the window on the front passenger side of the black sedan, thrust his arm out of the car, and then fired shots at the red Honda Civic. After the shooting, defendant then said, "Look for some shells, gun shells." Mr. Khaolaeiad disclaimed any prior knowledge of defendant's intent to shoot at the red Honda Civic. Later, the occupants of defendant's black sedan met up with the women in the car that had been pursued by the red Honda Civic. Defendant instructed everybody not to discuss what had happened. The firearm fired by defendant was a semiautomatic handgun.

Originally confronted by the police in May 1999, Mr. Khaolaeiad, who had been convicted of misdemeanor receiving stolen property in 1996, denied being in defendant's black sedan when the shots were fired. Later, in July 1999, Mr. Khaolaeiad admitted being in defendant's black sedan when the shots were fired. Mr. Khaolaeiad decided to change his story because he had become a suspect. Mr. Khaolaeiad originally lied because he was afraid he would be killed by members of the gang.

### D. Defendant's Testimony

Defendant, a California State University, Fullerton student and California Youth Authority parolee at the time of his arrest, testified he had previously been convicted of firearm possession by a felon in 1996 and conspiracy to shoot at an inhabited dwelling in 1993. On the evening of January 14, 1999, defendant worked at the Gallup Organization until 8:30 p.m. He then went to the Arena Club in Hollywood for Asian night. Mr. Vu drove and Ms. Saeidi accompanied defendant. On the way from Westminster to Hollywood, defendant and his friend and coworker at the Gallup Organization, Ms. Saeidi, sat in the backseat of the car and drank beer. Defendant testified there were "two six-packs of Corona" in the car. Defendant and his friends left the Arena Club around 2 a.m. Defendant saw the end of the fight involving the Vongkavivathanakul brothers. Defendant denied being involved in the fight.

Before leaving the parking lot, Mr. Khaolaeiad approached defendant. Defendant described the conversation as follows: "[Mr. Khaolaeiad] ran up to us and [Mr. Khaolaeiad] said if he could get a ride home because Chris, his friend . . . lives in L.A. Chris didn't want to drive all the way down back to Orange County and have to drive back up." Mr. Khaolaeiad got into the front passenger seat. Defendant got in to the backseat of his car with Ms. Saeidi so they could continue drinking. Defendant was seated in the right rear seat of his black sedan. Mr. Khaolaeiad was in the front passenger seat. Mr. Vu got behind the wheel of defendant's black sedan. Mr. Vu drove the black sedan to a nearby gas station. Defendant's brother was in a separate car. Defendant explained why Mr. Vu drove to the nearby gas station as follows: "We were going to stay over there to wait for my brother to see if we decided to go eat anywhere or just go straight home."

While waiting at the gas station, defendant received a cell phone call from Ms. Trang, his former girlfriend. Ms. Trang related that the car she was riding in was being followed by the red Honda Civic on a freeway. Ms. Trang said: "They're right behind us and they're just following us. Should we pull over or anything and wait up?" Defendant responded: "No, do not pull over. Go on the freeway and we'll be right there to catch up with you." Defendant then advised everybody in his black sedan of the situation involving "the girls." Defendant also telephonically advised his brother of the situation and instructed him to "hurry up and catch up." Mr. Vu then drove defendant's black sedan onto a nearby freeway in an effort to catch up with the women in the brown or plum colored Acura Integra.

While attempting to catch up with the women, a plan was conceived to deal with the occupants of the red Honda Civic. Defendant described the plan as follows: "The plan was for us to catch up to the car, try to somehow get some way to pull them over and get in a fight, just get in a fight with them. It was supposed to be our car, and my brother with Hien in his car." As the plan to attack occupants of the red Honda Civic was being discussed, defendant continued speaking telephonically with his brother and the women in the brown or plum colored Acura Integra. Defendant was attempting to verify his brother's location on the freeway. During these efforts to coordinate the location of the other cars, defendant said: "Okay. When we drive by, let's throw a Corona bottle at their car." Somebody else in the car responded: "Okay. How about we try to throw a Corona bottle." One of the occupants of defendant's car indicated the men in the red Honda Civic had the Club, the steering wheel locking device. Ms. Saeidi responded, "Well, we have a Club in the car." She reached down and picked up a Club off of the floor. Defendant testified that when the Club was unlocked, he always placed it on the floor next to the driver. Defendant took one of the two pieces

of the Club. Ms. Saeidi kept the other piece of the Club. Defendant also armed himself with a Corona bottle.

The group continued to discuss the plan to attack the men in the red Honda Civic. The plan called for the red Honda Civic to be forced to the side of the freeway. This would be accomplished by throwing a bottle at the red Honda Civic. Defendant admitted that in the past such high-speed chases had resulted in death. In 1995, a gang member and his girlfriend were killed during a high-speed chase. Defendant admitted that throwing the bottle was the type of conduct that "can get people killed." Defendant then changed his testimony and claimed he did not know that throwing a bottle at a speeding car on a freeway "can get somebody killed."

One of the occupants of defendant's car saw the plum or brown colored Acura Integra containing Ms. Castorena, Ms. Nguyen, and Ms. Trang. Mr. Khaolaeiad then rolled down the window. Defendant reached down to grab a Corona bottle. Mr. Khaolaeiad apparently pulled a handgun from his waistband, reached out of the car window, and fired shots at the red Honda Civic. As they passed the red Honda Civic, Mr. Khaolaeiad continued to shoot at the other car. Ms. Saeidi screamed and defendant said: "[Mr. Khaolaeiad] what the fuck? What the fuck are you just doing?" Mr. Vu said he thought the occupants of the red Honda Civic had shot at the black sedan. In other words, Mr. Vu thought the occupants of the red Honda Civic had shot at the occupants of defendant's black sedan. Mr. Khaolaeiad responded: "Don't worry about it. Don't worry about it." Ms. Saeidi said, "You better hope you didn't hit anybody in that car." Mr. Khaolaeiad responded: "Don't worry. I shot at the car, I only shot at the car." Defendant spoke later with Ms. Trang and his brother. Later in the morning when the occupants of the brown or plum colored Integra containing Ms. Castorena, Ms. Nguyen and Ms. Trang, met up in Westminster with defendant and Mr. Khaolaeiad, the shooting was not discussed.

Defendant never reported the shooting to the authorities because he was on parole. Defendant thought, given his involvement, he would be returned to custody if he reported the incident. Also, when defendant learned a death had occurred, he was "scared." Defendant admitted that detectives found a silhouette from a shooting range in the trunk of his black sedan. Despite the fact defendant had been convicted of being a felon in possession of a firearm, he admitted he had recently rented a gun for use at an indoor shooting range.

Defendant was fully aware of the risks of the planned assault on the occupants of the red Honda Civic. Previously, a gang member was killed

during a high-speed chase. Defendant admitted he was aware that people could be "seriously hurt in fights with weapons." Previously, in gang-related fights, people had been "seriously hurt" or killed.

Without objection, defendant testified on direct examination as to his substantial criminal background. In 1991, there was racial tension in the Huntington Beach high school defendant attended. Defendant and his friends got into fights with some "skinheads." After defendant's mother was threatened, defendant agreed to accompany some friends to shoot the person who apparently made the threat. However, defendant's coconspirators left before he got off work. Defendant's coconspirators shot three victims. Defendant lied to the police the day after the shootings. In 1996, defendant and some friends were going to shoot at a shooting range in the San Bernadino Mountains. After he and his friends purchased ammunition, the police stopped them. A search of the car uncovered some firearms. Even though defendant claimed not to have possessed any of the guns in the car, he was convicted of possession of a firearm by a felon. In 1999, while on California Youth Authority parole, defendant fired a gun at an indoor firing range.

## IV. DISCUSSION

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .*

The jurors were instructed on first and second degree murder. No manslaughter instructions of any kind were requested or given. Defendant argues there was a sua sponte duty to instruct on a target offense which would support an involuntary manslaughter lesser included offense verdict. Because there is no sua sponte duty to instruct on target offenses unless the prosecutor identifies it, we reject defendant's contention.

The sole first degree murder theory upon which the jury was instructed was based on the section 189 felony-murder rule.[5] As to second degree murder, the jury was instructed on two theories, express and implied malice. (See *People v. Frye* (1998) 18 Cal.4th 894, 962-963 [77 Cal.Rptr.2d 25, 959 P.2d 183]; *People v. Swain* (1996) 12 Cal.4th 593, 601 [49 Cal.Rptr.2d 390, 909 P.2d 994].) The first theory was based on express malice pursuant to CALJIC Nos. 8.10 and 8.11: "Every person who unlawfully kills a human being with malice aforethought is guilty of the crime of murder . . . . [¶] In order to prove this crime, each of the following elements must be proved: [¶]

---

*See footnote, *ante*, page 662.

[5]The pertinent provisions of section 189 state, "[A]ny murder which is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death, is murder of the first degree."

1. A human being was killed; [¶] 2. The killing was unlawful; and [¶] 3. The killing was done with malice aforethought. [¶] 'Malice' may be either express or implied. [¶] Malice is express when there is manifested an intention unlawfully to kill a human being." (See *People v. Myers* (1997) 59 Cal.App.4th 1523, 1535 [69 Cal.Rptr.2d 889]; *People v. Brown* (1995) 35 Cal.App.4th 1585, 1594 [42 Cal.Rptr.2d 155].)

The other second degree murder theory was premised on implied malice pursuant to CALJIC No. 8.11 as follows: "Malice is implied when: [¶] 1. The killing resulted from an intentional act, 2. The natural consequences of the act are dangerous to human life, and [¶] 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard, for human life. [¶] When it is shown that a killing resulted from the intentional doing of an act with express or implied malice, no other mental state need be shown to establish the mental state of malice aforethought." Further, these implied malice instructions were augmented with CALJIC No. 8.31 as follows: "Murder of the second degree is the unlawful killing of a human being when: [¶] 1. The killing resulted from an intentional act, [¶] 2. The natural consequences of the act are dangerous to human life, and [¶] 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life. [¶] When the killing is the direct result of such an act, it is not necessary to prove that the defendant intended that the act would result in the death of a human being." (See *People v. Rios* (2000) 23 Cal.4th 450, 460 [97 Cal.Rptr.2d 512, 2 P.3d 1066]; *People v. Hansen* (1994) 9 Cal.4th 300, 308 [36 Cal.Rptr.2d 609, 885 P.2d 1022].)

The jury was also instructed on aiding and abetting. The trial court gave the standard shared intent aiding and abetting instructions set forth in the margin.[6] (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118 [108 Cal.Rptr.2d 188, 24 P.3d 1210]; *People v. Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318].) Additionally, the trial court instructed the jury on a natural and probable consequences aiding and abetting theory. (*People v. McCoy, supra*, 25 Cal.4th at p. 1117; *People v. Sakarias* (2000) 22 Cal.4th 596, 627 [94 Cal.Rptr.2d 17, 995 P.2d 152].) The jury was instructed: "One

---

[6]The jury was instructed: "Persons who are involved in committing or attempting to commit a crime are referred to as principals in that crime. Each principal, regardless of the extent or manner of participation is equally guilty. Principals include: [¶] 1. Those who directly and actively commit or attempt to commit the act constituting the crime, or [¶] 2. Those who aid and abet the commission or attempted commission of the crime. [¶] A person aids and abets the commission of a crime when he . . . [¶] 1. With knowledge of the unlawful purpose of the perpetrator and [¶] 2. With the intent or purpose of committing or encouraging or facilitating the commission of the crime, and [¶] 3. By act or advice aids, promotes, encourages or instigates the commission of the crime. [¶] A person who aids or abets the commission of a crime need not be present at the scene of the crime."

who aids and abets another in the commission of a crime is not only guilty of that crime, but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crimes originally aided and abetted. [¶] . . . In order to find the defendant guilty as an aider and abettor of the crimes of Murder as charged in Count 1 or Attempted Murder as charged in Counts 2 through 4, you must be satisfied beyond a reasonable doubt that: [¶] 1. The crime of Shooting at an Occupied Car was committed; [¶] 2. That the defendant aided and abetted that crime; 3. That a co-principal in that crime committed the crimes of Murder and Attempted Murder; and [¶] 4. The crimes of Murder and Attempted Murder were a natural and probable consequence of the commission of the crime of Shooting at an Occupied Car." The jury was instructed as to the elements of the crime of shooting at an occupied automobile within the meaning of section 246.[7]

Defendant argues the trial court had a sua sponte duty to instruct on a target offense which would support a guilty verdict of the lesser included crime of involuntary manslaughter. The theory defendant posits is as follows: "Involuntary manslaughter occurs when the defendant commits an unintentional homicide in the course of an inherently dangerous misdemeanor, *People v. Stuart* (1956) 47 Cal.2d 167, 173 [302 P.2d 5, 55 A.L.R.2d 705], or in the course of a non-inherently dangerous felony which might produce death if committed without due caution and circumspection, *People v. Burroughs* (1984) 35 Cal.3d 824, 836 [201 Cal.Rptr. 319, 678 P.2d 894]. (See also *People v. Cameron* (1994) 30 Cal.App.4th 591, 603 [36 Cal.Rptr.2d 656]; *People v. Evers* (1992) 10 Cal.App.4th 588, 596 [12 Cal.Rptr.2d 637].)" Defendant continues: "Reasonable persons who did not believe that appellant possessed or shot a weapon, and who did not believe that the shooter had any intent to kill, and were to base homicide liability on appellant's agreement to a plan to stop the car by throwing a beer bottle at it, and fight the boys with a car Club, would or could have concluded that the natural and probable consequence of such a conspiratorial agreement was involuntary manslaughter, *even if* the natural and probable consequence for the shooter was more than that." (Original italics.) In other words, defendant argues that involuntary manslaughter instructions, premised upon a target offense apart from the shooting into the red Honda Civic, a violation of section 246, should have been given.

---

[7]The instructions concerning section 246 given to the jury was as follows: "Defendant is accused in Count 5 of having committed the crime of shooting at an occupied motor vehicle, a violation of section 246 . . . . [¶] Every person who willfully, unlawfully and maliciously discharges a firearm at an occupied motor vehicle is guilty of the crime of shooting at an occupied motor vehicle in violation of . . . section 246. [¶] In order to prove this crime, each of the following elements must be proved: [¶] 1. A person unlawfully discharged a firearm at an occupied motor vehicle; and [¶] 2. The discharge of the firearm was willful and malicious."

Defendant relies principally upon his own testimony. Defendant testified that Mr. Khaolaeiad fired the fatal shots. Defendant testified that after he was paroled from the California Youth Authority he stopped participating in gang activities. Defendant had no knowledge Mr. Khaolaeiad had a gun. According to defendant, the shooting occurred after the four occupants of his black sedan *agreed* to throw a bottle of Corona beer at the red Honda Civic which was speeding down a freeway. After the red Honda Civic was forced to the side of the road, its occupants would be assaulted by defendant and his confederates. Defendant and Ms. Saeidi had armed themselves with parts of a metal steering wheel lock called the Club. A photograph of the Club, two separate sticks of steel, which was discovered in defendant's black sedan was in evidence. Defendant reasons that if the jury accepted his testimony, then he could be convicted on the theory he aided and abetted a plan to engage in a fight which, to his complete surprise, gave rise to the shooting by Mr. Khaolaeiad. In other words, the shooting resulted from a plan to throw the beer bottle at the red Honda Civic and then engage in a misdemeanor simple assault on the Vongkavivathanakul brothers, Mr. Nguyen, and Mr. Tran. Since defendant admitted aiding and abetting in the plan to merely commit a simple assault, he reasons that the jury should have been instructed on such a target offense as a basis for an involuntary manslaughter verdict.

We disagree with defendant for two reasons. ■ The first problem with defendant's argument is that there was no sua sponte duty to instruct on additional target offenses. Typically, there is a sua sponte duty to instruct on lesser included offenses. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1084 [119 Cal.Rptr.2d 859, 46 P.3d 335]; *People v. Breverman* (1998) 19 Cal.4th 142, 154 [77 Cal.Rptr.2d 870, 960 P.2d 1094].) Under most circumstances, involuntary manslaughter is a lesser included offense of murder. (*People v. Prettyman, supra,* 14 Cal.4th at p. 274; *People v. Edwards* (1985) 39 Cal.3d 107, 116, fn. 10 [216 Cal.Rptr. 397, 702 P.2d 555].) But the California Supreme Court has held that there is *no* sua sponte duty to instruct on target offenses on a natural and probable consequences aiding and abetting theory unless they are identified by the prosecutor. In *People v. Prettyman, supra,* 14 Cal.4th at page 269, the California Supreme Court described the sua sponte duty to instruct on target offenses in natural and probable consequences aiding and abetting cases as follows: "We also recognize that 'the trial court cannot be required to anticipate every possible theory that may fit the facts of the case before it and instruct the jury accordingly.' (*People v. Wade* (1959) 53 Cal.2d 322, 334 [1 Cal.Rptr. 683, 348 P.2d 116].) But the sua sponte duty to instruct that is imposed here is quite limited. It arises only when the prosecution has elected to *rely* on the 'natural and probable consequences' theory of accomplice liability and the trial court has

determined that the evidence will support instructions on that theory. The trial court, moreover, need not identify *all* potential target offenses supported by the evidence, but only those that the prosecution wishes the jury to consider." (Fn. omitted, original italics; see *People v. Dawson* (1997) 60 Cal.App.4th 534, 544-545 [71 Cal.Rptr.2d 33].) The omitted footnote in *Prettyman* states, "If the prosecutor requests that the jury be instructed on the 'natural and probable consequences' doctrine, but fails to identify potential target crimes, the trial court should inquire about the particular target offenses on which instruction is desired." (*People v. Prettyman, supra,* 14 Cal.4th at p. 269, fn. 9.) Because the prosecutor never requested the trial court to consider the target offense described for the first time on appeal by defendant, simple assault, there was no sua sponte duty to so instruct.

Of course, we do not reach the issue of whether there may be a duty to instruct in a proper case if defense counsel *requests* appropriate target offenses which would support a lesser included offense verdict. Further, we do not discuss the question of whether the trial court may raise the issue of additional target offenses not requested by the prosecutor. All we are stating is that *Prettyman* holds, as it clearly does, absent a request by the prosecutor for instructions on target offenses to serve as the basis for natural and probable consequences aiding and abetting liability, no sua sponte duty to instruct exists. (*People v. Prettyman, supra,* 14 Cal.4th at p. 269.)

■  The second problem with defendant's instructional error contention is that under no state of the facts could involuntary manslaughter instructions be given based upon a natural and probable consequences aiding and abetting theory. Defendant cites to two ways the crime of involuntary manslaughter can be committed. For example, a killing occurring during the commission of a misdemeanor which is dangerous to human life under the circumstances of its commission can constitute involuntary manslaughter. (*People v. Cox* (2000) 23 Cal.4th 665, 675 [97 Cal.Rptr.2d 647, 2 P.3d 1189]; *People v. Wells* (1996) 12 Cal.4th 979, 980 [50 Cal.Rptr.2d 699, 911 P.2d 1374].) Defendant theorizes that the fight that he and the other occupants of his black sedan envisioned after the bottle was thrown at the red Honda Civic speeding down a freeway thereby forcing it to the side of the road constituted such misdemeanor conduct. We disagree. Throwing the beer bottle under these circumstances constituted a felony pursuant to provisions of Vehicle Code section 23110, subdivision (b).[8] Using the steering wheel locking device, the Club, which is essentially two steel rods, to assault the occupants of the red Honda Civic cannot logically be construed to be an

---

[8]Vehicle Code section 23110, subdivision (b) states, "Any person who with intent to do great bodily injury maliciously and willfully throws or projects any rock, brick, bottle, metal or other missile, or projects any other substance capable of doing serious bodily harm at such

unlawful act not amounting to a felony. The metal Club used to bludgeon an occupant of the red Honda Civic would certainly constitute a deadly weapon so as to fall within the ambit of section 245, subdivision (a).[9] Of course, the agreement among defendant, Mr. Vu, Ms. Saeidi, and Mr. Khaolaeiad constituted a conspiracy which is chargeable as a felony.[10] There is no merit to defendant's misdemeanor involuntary manslaughter contention.

Another way involuntary manslaughter can be committed is when a noninherently dangerous felony is committed without due caution and circumspection. (*People v. Burroughs, supra*, 35 Cal.3d at p. 835 ["[T]he only logically permissible construction of section 192 is that an unintentional homicide committed in the course of a noninherently dangerous felony may properly support a conviction of involuntary manslaughter, if that felony is committed without due caution and circumspection"]; *People v. Albritton* (1998) 67 Cal.App.4th 647, 654 [79 Cal.Rptr.2d 169] [same].) The reference to "due caution and circumspection" is to criminal negligence. (*People v. Evers, supra*, 10 Cal.App.4th at p. 596; see *People v. Penny* (1955) 44 Cal.2d 861, 879 [285 P.2d 926].) We cannot equate a conspiracy to feloniously throw a bottle at a car speeding on the freeway, force it over to the side of the roadway, and then assault the occupants of the automobile with a metal device such as the Club as a criminally negligent act. Defendant knew a gang member had been killed during a high-speed chase. Defendant knew that fights of the type contemplated by him and his confederates in the black sedan could result in death. Defendant's actions were plainly deliberate, not criminally negligent, conduct. (*People v. Evers, supra*, 10 Cal.App.4th at pp. 597-598 [intentional use of violent force precludes finding of criminal negligence]; *People v. Wright* (1976) 60 Cal.App.3d 6, 12-13 [131 Cal.Rptr. 311], disapproved on another point in *People v. Wells, supra*, 12 Cal.4th 979, 988 [deliberate infliction of violence precluded instructing the jury on involuntary manslaughter criminal negligence theory].) Therefore, even under defendant's version of the facts, involuntary manslaughter instructions should not have been given.

---

vehicle or occupant thereof is guilty of a felony and upon conviction shall be punished by imprisonment in the state prison."

[9]Section 245, subdivision (a)(1) states, "(a)(1) Any person who commits an assault upon the person of another with a deadly weapon or instrument other than a firearm or by any means of force likely to produce great bodily injury shall be punished by imprisonment in the state prison for two, three, or four years, or in a county jail for not exceeding one year, or by a fine not exceeding ten thousand dollars ($10,000), or by both the fine and imprisonment."

[10]Section 182, subdivision (a) states in pertinent part: "If two or more persons conspire: [¶] (1) To commit any crime. [¶] . . . [¶] They are punishable as follows: [¶] . . . [¶] When they conspire to commit any other felony, they shall be punishable in the same manner and to the same extent as is provided for the punishment of that felony."

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*

## V. Disposition

The abstract of judgment is modified to state that defendant has been convicted of second degree murder. In all other respects, the judgment is affirmed.

Armstrong, J., concurred.

**MOSK, J.**—I respectfully dissent.

*Sua Sponte Instruction*

An authority on California criminal law states, "Failure to instruct on an essential element of an offense charged is error 'whenever there is any evidence deserving of any consideration from which the jury could have found in favor of the defendant on the omitted element.' The error denies the defendant's right to have the jury determine every material issue presented by the evidence, regardless of overwhelming evidence of guilt. [Citation.]" (5 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Criminal Trial, § 609, p. 869.)

Here, the prosecutor argued a target offense that was something other than shooting at an occupied car—namely, planning to throw an object at a car and to fight—which target offense could have been conspiracy to commit a simple assault or a battery, possible misdemeanors. *People v. Prettyman* (1996) 14 Cal.4th 248 [58 Cal.Rptr.2d 827, 926 P.2d 1013] (*Prettyman*) and *People v. Baker* (1999) 74 Cal.App.4th 243 [87 Cal.Rptr.2d 803] (*Baker*) compel the trial court to instruct the jury on such target offenses because there was sufficient evidence to support that instruction. Because the jury could have found Quan Le Huynh (Huynh) guilty of a killing during the course of a conspiracy to commit a misdemeanor, the court should have given an involuntary manslaughter instruction as a lesser included offense.

*Prettyman* supports the position that the trial court had a sua sponte duty to identify the target offenses that Huynh aided and abetted and to instruct the jury on those target offenses. The court in *Prettyman* said that "such an instruction is necessary and should be given whenever uncharged target offenses form a part of the prosecution's theory of criminal liability and substantial evidence supports the theory." (*Prettyman, supra,* 14 Cal.4th at pp. 266-267.) The court added that the duty to so instruct arises "when the

---

*See footnote, *ante*, page 662.

prosecution has elected to *rely* on the 'natural and probable consequences' theory of accomplice liability and the trial court has determined that the evidence will support instructions on that theory." (*Id.* at p. 269.) Thus, *Prettyman* requires the trial court to identify those target offenses on which the prosecutor *relies or argues to the jury*, and not just those that the prosecutor expressly requests be considered in an instruction.

Here, the prosecutor, in his closing argument, repeatedly relied on and asked the jury to consider target offenses other than shooting at an occupied car. The prosecutor argued that even if the jury believed Huynh's version of the events, Huynh was still guilty of murder. This is so, according to the prosecutor, because under that version Huynh entered into a plan to stop Andrew and Vincent Vongkavivathanakul's car by throwing a bottle at the car and to fight with the occupants of that car using a part of a car steering wheel locking device (Club) for protection, the natural and probable consequence of which plan was murder. The prosecutor having *relied on and presented to the jury* a target offense of conspiracy to commit an assault or possibly a battery, the trial court should have instructed the jury on that target offense and the consequences thereof.

A target offense of conspiracy to commit an assault or a battery can support as a natural and probable consequence involuntary manslaughter, a lesser included offense of murder, because an assault or battery or conspiracy to commit an assault or a battery, even with a deadly weapon, can be a misdemeanor, as well as a felony. (Pen. Code, §§ 17, 182, 241, subd. (a), 242, 243, 245, subd. (a); *In re Larkin* (1989) 48 Cal.3d 236, 241 [256 Cal.Rptr. 90, 768 P.2d 604] [defendant convicted of misdemeanor conspiracy to commit assault with a deadly weapon].) For there to be a felony violation of Vehicle Code section 23110, subdivision (b), there must be an "intent to do great bodily injury maliciously and willfully." Huynh, in effect, denied such intent.

In *Baker, supra,* 74 Cal.App.4th at page 251, the court held that facts similar to those here could give rise to a simple assault and therefore the court had a duty to instruct sua sponte on that offense. In *Baker*, as here, there was a confrontation. The defendants threatened revenge, left and returned to the victim's home, armed with two knives, pieces of a steering wheel locking device, and wooden stakes. (*Id.* at p. 248.) Baker stabbed and killed the victim. (*Ibid.*) A codefendant said he thought there might be a fight and gave Baker a knife. (*Id.* at p. 253.) On appeal, defendants argued that the trial court should have instructed the jury on lesser included offenses of voluntary manslaughter, conspiracy to commit assault, and assault. (*Id.* at p. 251.) Division Two of this court held that the trial court committed prejudicial error in failing to instruct the jury on the lesser included offenses. (*Id.* at

pp. 252-254; see also *People v. Hickles* (1997) 56 Cal.App.4th 1183, 1197 [66 Cal.Rptr.2d 86] [evidence supported a finding of assault with a deadly weapon or a simple assault].) The appellate court said that the "jury could have found that appellants' intent upon entering [the victim's] home was not felonious. There was evidence . . . that [the defendant] . . . returned to [the victim's] home . . . at most to engage in a fistfight." (*Baker, supra,* at p. 251.)

Substantial evidence here established that Huynh may be guilty of involuntary manslaughter. Huynh testified that, on the night of the incident, Tina Trang called him and told him that she was being followed by the men who had just been involved in a fight at the club. Huynh said he did not have a gun and he did not know that Max Khaolaeiad did have a gun. He said that it was his intent to throw a beer bottle at the Vongkavivathanakuls' car, to cause the car to pull over, and, if necessary, to fight with the car's occupants. Huynh stated there was no "concrete plan." He asserted he wanted to prevent the Vongkavivathanakuls from following Huynh's friends, and he added that "hopefully they'll [the Vongkavivathanakuls' car] just veer off and we can take off . . . ." Huynh picked up a part of the Club because he thought the Vongkavivathanakuls had a Club. He said he had no intent to do anything that might result in a death. According to Huynh, when he and his companions neared the car, Max Khaolaeiad—to Huynh's surprise—pulled out a gun and fired shots at the victims' car.

Based on the conflicting testimony, the jury could have believed that Max Khaolaeiad fired the gun and that the natural and probable consequence of Huynh's conduct—a plan to throw a beer bottle at the car and fight the car's occupants—was involuntary manslaughter, arising out of a plan to commit a simple assault or a battery. (See *Baker, supra,* 74 Cal.App.4th 243; *People v. Hickles, supra,* 56 Cal.App.4th 1183; *People v. Lee* (1937) 23 Cal.App.2d 168 [72 P.2d 572] [jury verdict of simple assault was supported despite evidence that defendant used a deadly weapon]; compare *People v. Woods* (1992) 8 Cal.App.4th 1570, 1577, 1593 [11 Cal.Rptr.2d 231] [because evidence was that defendant engaged in an assault armed with a gun, defendant could not be guilty of anything less than second degree murder; thus there was no error in failing to instruct on involuntary manslaughter].) If the jury believed Huynh and believed he did not fire the gun or know of its intended use, the jury might have concluded that involuntary manslaughter, and not second degree murder, was the natural and probable consequence of Huynh's intent or conspiracy to throw a bottle at a car and engage in a fight.

It appears reasonably probable that the jury *did* believe Huynh's version of the events because the jury verdicts cannot be reconciled with a finding

that Huynh fired the gunshots. (See *People v. Milwee* (1998) 18 Cal.4th 96, 157 [74 Cal.Rptr.2d 418, 954 P.2d 990] [proper to review jury verdicts actually rendered to determine whether prejudicial error occurred].) The jury did not find Huynh guilty of attempted murder of David Tran and the Vongkavivathanakuls; of weapon enhancement allegations; or of being a felon in possession of a gun—charges on which the jury would have rendered guilty verdicts had it believed that Huynh was the shooter. Thus, the jury convicted Huynh of murder through an aider and abettor theory of liability. An aider and abettor can be guilty of a lesser included offense even if the actual perpetrator of the crime is guilty of a greater offense. (*People v. Woods, supra,* 8 Cal.App.4th 1570.)

The failure to give the instructions requires reversal. (See generally *People v. Breverman* (1998) 19 Cal.4th 142, 176-178 [77 Cal.Rptr.2d 870, 960 P.2d 1094] [miscarriage of justice occurs when it appears reasonably probable that the defendant would have achieved a more favorable result had the error not occurred under the test for harmless error set forth in *People v. Watson* (1956) 46 Cal.2d 818 [299 P.2d 243]].)

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .*

A petition for a rehearing was denied July 15, 2002, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied September 25, 2002.

---

*See footnote, *ante*, page 662.