Filed 10/24/23 P. v. Moy CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B321804 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA104428) |
| v. | |
| TYRONE DEVONTE MOY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Daniel J. Lowenthal, Judge. Affirmed.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Wyatt E. Bloomfield and Nicholas J. Webster, Deputy Attorneys General, for Plaintiff and Respondent.

_____

On April 1, 2022, a jury found defendant and appellant Tyrone Devonte Moy guilty of first degree murder (count 1; Pen. Code, § 187, subd. (a)),[1] with a true finding that defendant personally discharged a firearm causing great bodily injury (§ 12022.53, subds. (b)-(d)).  The jury also found defendant guilty of possession of a firearm by a felon (count 2; § 29800, subd. (a)(1)) and two counts of assault with a firearm (counts 4 & 5; § 245, subd. (a)(2)) with a true finding that defendant personally used a firearm (§ 12022.5).[2]  The trial court sentenced defendant to 25 years to life for count 1, and also imposed a concurrent term of 10 years, composed of eight months for count 2, three years for count 4, plus four years for the firearm enhancement, and one year for count 5, plus 16 months for the firearm enhancement.

Defendant timely appealed.  He argues that the trial court erred in failing to (1) instruct the jury that Marcia Macias (Macias) was an accomplice as a matter of law; and (2) stay his sentence on count 2 pursuant to section 654.

We affirm.

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

[2]     Count 3 alleged that Mariah Rice (Rice) was an accessory after the fact to murder.  (§ 32.)

## FACTUAL BACKGROUND

I. *Defendant shot and killed the victim after they fought over which gang controlled Ramona Park*

### A. The initial fight at the park

USO Squad and Mac Mafia were street gangs that both claimed territory near Ramona Park in Long Beach.

On May 3, 2016, Abel Jones (Jones), Ernest Foree, and Geron Lacy (Lacy) were at Ramona Park. Lacy, a member of USO Squad, started "banging on people," which is a gang-related term indicating that Lacy was asking about other individuals' gang affiliations. Lacy said he was from USO Squad and that the park was USO Squad territory. A Mac Mafia member, Joshua Robinson (Robinson), responded that the park belonged to Mac Mafia. Defendant, also a Mac Mafia member, approached and said that he would back up Robinson in a fight. Defendant took off his shirt and immediately threw a punch at Lacy. He and Lacy punched each other. Soon, many people joined in the fight.

### B. The fight disperses and people leave

After about 20 minutes, the fight dispersed. Alexus Gilmore (Gilmore) and Vanity Lebeau (Lebeau), who were dating at the time and are now married, were associates of Mac Mafia. After the fight, many people got into Gilmore's red Chevy Impala, including Lebeau, defendant, Robinson, and Marvin Lard (Lard), Lebeau's brother.[3] Gilmore drove to Andy Street, which was a nearby Mac Mafia stronghold.

---

[3] Lard was also a Mac Mafia associate and maybe a member of the gang.

3

C.  <u>Defendant exits the car, returns minutes later, and instructs Macias to drive back to the park</u>

On Andy Street, Gilmore parked next to Macias and Rice, who were in a blue Nissan.  Macias was driving the car, but it belonged to Rice.  Defendant and Lard got out of Gilmore's car.  Defendant was still not wearing a shirt.  Defendant went somewhere out of sight for approximately five minutes and returned.  Defendant and Lard then got into Macias's car.  Defendant sat in the back seat on the right side of the car, and Lard sat behind the driver in the back seat on the left side of the car.  Rice was still in the front passenger seat.  Defendant told Macias to drive to Ramona Park because "there was a fight, and a boy and his family were waiting."

Macias started driving to the park.  Gilmore followed because people were saying that they wanted to go back to the park to fight.

Defendant was upset and directed Macias to drive with urgency to the park.  Defendant was talking about the fight.

D.  <u>Defendant shoots and kills Lacy</u>

When they arrived at the park, defendant directed Macias to drive around a truck that was stopped at a stop sign.  They passed Lacy, and defendant shot him by firing the gun out of the window.  Rice identified defendant as the shooter and testified that the shots came from directly behind her, where defendant was sitting.

Meanwhile, Lacy and Jones had stayed at the park.  They were talking about the fight when Jones noticed that the red Impala that left earlier had returned.  Jones saw defendant, whom he recognized from the fight, holding a revolver out of a car

4

window.  Defendant shot at Lacy from the back right seat.  He hit Lacy in the back of the head with one bullet.

Lacy was pronounced dead at the scene.

E. <u>Multiple witnesses identify defendant as the shooter</u>

Gilmore was driving behind Macias's car and saw the shooting.  She knew that defendant was the shooter because the shots came from the back right side of the car, the shooter was not wearing a shirt, and the shooter had prominent tattoos.

Lebeau, riding in the front passenger seat of Gilmore's car, also saw the shooting and identified defendant as the shooter because the shots came from the back passenger seat.  She could see that the shooter was not wearing a shirt, and defendant did not have on a shirt when he got into the car.

F. <u>Macias, defendant, and the others drive away</u>

Macias drove away.  Defendant told her to "slow down" and head back to Andy Street.  When they arrived at Andy Street, defendant was still in the back right seat.  Many people went to Macias's apartment.  Macias told Rice to park her car at a nearby church in case the car was being followed; Rice arranged for that to happen.

Gilmore also parked her car at the church and went to Macias's apartment.  Everyone was in shock.  They were asking defendant, "'Why did you do that?  Why would you shoot at a park when there's kids there.'"  Defendant replied, "'Y'all better not say nothing.  Shut up.'"

II. *Investigative work and testimony at trial*

A. <u>Jones</u>

Days after the shooting, police showed Jones a photographic lineup, and Jones identified defendant as the shooter.  Jones was immediately certain when he made his

identification and pointed out defendant's photograph. Although Jones identified Lard as the shooter at the preliminary hearing when he was asked to look at the counsel table with both Lard and defendant present, he also identified defendant as the shooter at trial.

B. <u>Rice, Lebeau, and Gilmore</u>

Rice, Lebeau, and Gilmore were originally charged with murder in this case, and eventually pleaded guilty to murder pursuant to a leniency agreement in which the charges would be reduced to one count of being an accessory to murder. Their truthful testimony was a prerequisite to the leniency agreement; failure to testify truthfully would result in being sentenced on the murder charge. At trial, all three of them provided a version of events substantially consistent with the summary of facts set forth above. That said, before the leniency agreement was in place, Rice, Lebeau, and Gilmore were not always forthcoming with law enforcement.

C. <u>Macias</u>

Macias also testified at trial. She was originally charged with murder, but as a result of legislative changes to murder liability,[4] she pleaded guilty to assault likely to cause great bodily injury. When testifying at trial, she claimed that she could not

---

[4] Effective January 1, 2019, Senate Bill No. 1437 (2017-2018 Reg. Sess.) was enacted to "amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)

recall anything about the shooting.  The trial court found that Macias was being disingenuous in her claim that she could not remember.  Her prior inconsistent statements were admitted into evidence by playing recorded portions of a law enforcement interview.

In that interview, Macias was reluctant to talk because she was afraid for her family's safety.  Macias originally denied being the driver of Rice's car.  However, she eventually admitted that fact.

Macias said during the interview that when defendant first arrived at Andy Street and got out of Gilmore's car, he was upset.  He was not wearing a shirt.  Defendant left for a few minutes and then came back.  Three males got into the backseat of the car Macias was driving, including defendant.  Defendant was sitting in the middle back seat.[5]  A person she identified as "J Mac"[6] sat in the right rear passenger seat.

Macias drove to the park and Gilmore followed in her car.  Defendant was angry on the drive to the park.  He made statements like, "[T]his n**** got me f****ed up, like, he should've never took off on me first."  Macias told defendant that she heard that he had hit Lacy first.  Defendant told her to "shut the f*** up."  The men in the backseat discussed fighting Lacy, but there was no talk of any guns.  Defendant said that he

---

[5]    As noted, the other witnesses in the case stated that there were two individuals in the backseat, defendant and Lard.  The prosecution was not able to question Macias about this inconsistency between the testimonies because she feigned being unable to recollect anything when she testified.

[6]    J Mac was identified elsewhere as Robinson.

wanted to return to the park and fight. Macias thought they were going back to fight. She did not know that defendant had a handgun.

Defendant told Macias not to park, so she pulled up to drop him off. He said, "'There goes that n****,'" around the same time that he shot Lacy. Macias heard two shots. She did not know that defendant had a gun until they were at the park and defendant fired his gun. Defendant had to lean over Robinson in the right rear passenger seat to shoot out the window.

After the shooting, Macias drove back to Andy Street. She cussed at defendant for committing the shooting. Defendant replied that he did not care and said he should have someone beat her up. When someone else in the car expressed that they were upset with defendant's actions, he said, "'It's already done.'"

The next day, defendant told Macias that Lacy died and he (defendant) could not be in the area. He told her not to talk to the police. During an interview with police, she identified defendant as the shooter in a six-pack photographic lineup.

**DISCUSSION**

I. *Alleged instructional error*

Defendant argues that CALCRIM No. 334, which required him to prove that Macias was an accomplice, was given in error because Macias was an accomplice as a matter of law under the natural and probable consequences theory.

A. <u>Relevant proceedings below</u>

Prior to closing arguments, the parties discussed jury instructions outside the presence of the jury. In particular, the parties and trial court considered whether Macias qualified as an accomplice as a matter of law for purposes of CALCRIM No. 335. Initially, the trial court stated that Rice, Lebeau, Gilmore, and

8

Macias were all accomplices as a matter of law and instructed the jury with CALCRIM No. 335[7] as to each of them.

However, after discussion with the attorneys and review of *People v. Garrison* (1989) 47 Cal.3d 746, the trial court informed the jury that it had misread an instruction. As to Macias, the trial court then instructed the jury with CALCRIM No. 334[8] that defendant had the burden of proving that Macias was an accomplice.

B. <u>Relevant law and standard of review</u>

Section 1111 provides, in relevant part, that a conviction cannot be based on the testimony of an accomplice unless the testimony is corroborated by independent evidence that connects the defendant to the crime. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 103 (*Coffman and Marlow*).) An "accomplice" is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111; see also *Coffman and Marlow, supra*, at p. 103.) This definition includes principals and aiders and abettors, but excludes persons who are merely

---

[7] CALCRIM No. 335 instructed the jury that these individuals were accomplices, and accomplice testimony could not be relied on by itself to convict defendant; supporting evidence connecting defendant to the crime was required.

[8] CALCRIM No. 334 instructed the jury that it had to determine if Macias was an accomplice. If it found that she was not an accomplice, then the instruction directed the jury to evaluate her testimony as it would any other witness. If, on the other hand, the jury found that she was an accomplice, the jury was directed to view her testimony with suspicion and supporting evidence was required to convict defendant.

accessories. (*People v. Fauber* (1992) 2 Cal.4th 792, 833–834 (*Fauber*).)

"All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission, . . . are principals in any crime so committed." (§ 31; accord, *People v. Horton* (1995) 11 Cal.4th 1068, 1113–1114; *Fauber*, *supra*, 2 Cal.4th at p. 833.) To be liable as an aider and abettor, one must act both with knowledge of the perpetrator's criminal purpose and the intent of encouraging or facilitating commission of the offense. (*People v. Hayes* (1999) 21 Cal.4th 1211, 1271, fn. 19.) An aider and abettor is liable not only for the offense that he or she intended to facilitate or to encourage, but also for any reasonably foreseeable offense committed by the principal. (*Id.* at p. 1271, fn. 20.) Yet "'[m]ere presence at the scene of a crime which does not itself assist its commission or mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting.' [Citations.]" (*People v. Pettie* (2017) 16 Cal.App.5th 23, 57.)

Accessories, defined in section 32, "are not accomplices as to whose testimony corroboration is required." (*Coffman and Marlow*, *supra*, 34 Cal.4th at p. 103.)

A trial court has a sua sponte duty to instruct the jury on how to treat accomplice testimony if the trial evidence suggests that a witness could be an accomplice. (*People v. Tobias* (2001) 25 Cal.4th 327, 331; *People v. Guiuan* (1998) 18 Cal.4th 558, 569.) "Whether someone is an accomplice is ordinarily a question of fact for the jury; only if there is no reasonable dispute as to the facts or the inferences to be drawn from the facts may a trial

court instruct a jury that a witness is an accomplice as a matter of law." (*People v. Valdez* (2012) 55 Cal.4th 82, 145–146; see also *Fauber*, *supra*, 2 Cal.4th at p. 834; *People v. Tewksbury* (1976) 15 Cal.3d 953, 960.) "The Bench Notes to CALCRIM No. 335 are in accordance with this statement of the law and, in no uncertain terms, advise that a trial court should: 'Give this instruction only if the court concludes that the witness is an accomplice as a matter of law or the parties agree about the witness's status as an accomplice. [Citation.] If there is a dispute about whether the witness is an accomplice, give CALCRIM No. 334.[']" (*People v. Johnson* (2016) 243 Cal.App.4th 1247, 1269.)

When the issue of whether a witness is an accomplice is disputed, "[t]he burden is on the defendant to prove by a preponderance of the evidence that a witness is an accomplice." (*Fauber*, *supra*, 2 Cal.4th at p. 834.)

We review a claim for instructional error de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "In reviewing a claim of instructional error, the court must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution." (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) We consider the challenged instruction "in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner." (*People v. Houston* (2012) 54 Cal.4th 1186, 1229.)

C. The trial court properly declined to instruct CALCRIM No. 335 as to Macias

As defendant points out, and as the People agree, at the time of the crime, Macias was potentially liable for second degree

11

murder under the natural and probable consequences doctrine because she drove defendant to the park.[9]  (*People v. Chiu* (2014) 59 Cal.4th 155 [a defendant may be guilty of aiding and abetting second degree murder under the natural and probable consequences theory]; *People v. Gordon* (1973) 10 Cal.3d 460, 469 disapproved of on another ground by *People v. Ward* (2005) 36 Cal.4th 186, 212.)  That said, the trial court correctly did not instruct that she was an accomplice as a matter of law (CALCRIM No. 335) because Macias's status as an accomplice was a matter of reasonable dispute.

To be found guilty under the natural and probable consequences doctrine, "the trier of fact must find that the defendant, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of a predicate or target offense; (3) by act or advice aided, promoted, encouraged or instigated the commission of the target crime.  But the trier of fact must also find that (4) the defendant's confederate

---

[9]     The fact that, at the time of trial, that theory of murder had been vitiated does not determine whether Macias was an accomplice.  (See *People v. Gentile* (2020) 10 Cal.5th 830, 843 ["Senate Bill 1437 bars a defendant from being convicted of second degree murder under a theory that the defendant aided and abetted a crime, the natural and probable consequence of which was murder"].)  To the extent the trial court believed that accomplice liability is measured at the time of trial, we still affirm the judgment because, as discussed below, Macias was not an accomplice as a matter of law.  (See *People v. Zapien* (1993) 4 Cal.4th 929, 976 [a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason].)

committed an offense other than the target crime; and (5) the offense committed by the confederate was a natural and probable consequence of the target crime that the defendant aided and abetted." (*People v. Prettyman* (1996) 14 Cal.4th 248, 262, italics & fn. omitted; see also *People v. Gonzales* (2001) 87 Cal.App.4th 1, 8.)

As applied to this case, for Macias to have been guilty of murder under the natural and probable consequences doctrine, a factfinder would have had to conclude that Macias: (1) acting with knowledge of defendant's unlawful purpose; and (2) with the intent or purpose of committing or encouraging or facilitating the commission of a predicate or target offense (assault); (3) by act or advice aided, promoted, encouraged or instigated the commission of the target crime (assault); and (4) defendant committed murder, which (5) was a natural and probable consequence of the target crime.

Although there was some evidence to support this theory, the evidence was not so compelling and overwhelming that it showed that Macias was an accomplice as a matter of law. For example, even if it is true that Macias knew that defendant would commit a crime when he returned to the park (assault), some factfinders might decide that murder was not a natural and probable consequence of that assault. (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 531 (*Nguyen*).) After all, Macias told law enforcement that she did not know that defendant was going to bring a gun and assault Lacy via firearm, rather than continue the fistfight. (See *People v. Avila* (2006) 38 Cal.4th 491, 566–567 ["although circumstantial evidence indicated Rojas was an accomplice in Medina's rape and in the murders, such evidence did not compel a conclusion that he was an accomplice, in light of

13

his denial of involvement in those crimes. Accordingly, the trial court did not err in ruling that Rojas's accomplice status was a jury question"].) In other words, while some factfinders might agree with defendant that the evidence showed that Macias was an accomplice based on the natural and probable consequences doctrine, the circumstances were not so obvious that—as a matter of law—every reasonable factfinder would agree. (*People v. Hayes*, *supra*, 21 Cal.4th at pp. 1271–1272.)

*People v. Medina* (2009) 46 Cal.4th 913 (*Medina*) does not compel a different result. In that case, the issue was whether substantial evidence supported the murder and attempted murder convictions. (*Id*. at p. 919.) Thus, the question presented was whether "'"*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."'" [Citation.]" (*Ibid*.) That is not the issue in the instant case; in this case, the question presented is whether every reasonable factfinder would agree that Macias was guilty of murder as a matter of law.[10] The finding of sufficient evidence in *Medina* only shows Macias could have theoretically been convicted in this case—not that she was guilty as a matter of law.

Defendant contends that Macias knew that he was armed when he entered her car; therefore, she must have known as a matter of law that death was a natural and probable consequence

---

[10] For similar reasons, defendant's reliance upon *People v. Montes* (1999) 74 Cal.App.4th 1050, 1055–1056, and *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1375–1376 is misplaced. While those courts recognized that gang confrontations can easily escalate to gunfire, they did not hold that such confrontations always (or must as a matter of law) so escalate.

14

of the upcoming assault at the park.  There are several problems with defendant's argument.

*First*, it is not supported by the record.  Macias, in her interview with law enforcement, stated plainly that the first time she saw the handgun was at the park.  While Macias drove defendant to the park, defendant and the males in the car discussed fighting Lacy, but there was no talk of any handgun.  She thought they were going back to fight.

Relying on a single page in the supplemental clerk's transcript, defendant claims that Macias knew that defendant had the firearm when she drove him to the park.  Defendant misinterprets the appellate record.  When the exchange between Macias and the detectives is read in context, it is clear that Macias did not know that defendant had a firearm when he entered the car:

"Detective Goodman:  Okay.  Well, uh, tell me this.  Who brought the gun out to give to [defendant] or did [defendant] have it the whole time?

"Maria Macias:  [Defendant] had it.

"Detective Goodman:  The whole time?

"Maria Macias:  When he got in the car.

"Detective Goodman:  Okay.

"Maria Macias:  When—when—when [defendant] got in the car, nobody handed [him] nothing.  So [defendant] had it.

"Detective Goodman:  How about—okay.  So before—before he entered the car, nobody handed it to him?

"Maria Macias:  No.  Nobody handed him nothing.

"Detective Goodman:  Okay.

"Maria Macias:  [Defendant]—[defendant] must have had it on him the whole time, or—or something."

In this exchange, Macias was not admitting that she knew that defendant had the handgun with him the entire time; instead, consistent with earlier statements, she was reasoning that he "must have had it on him the whole time" because nobody handed him a handgun when he entered the car. These pages of the appellate record do not support the inference that Macias knew that defendant had the handgun when he entered the car.

*Second*, even assuming that Macias did state that she knew that defendant had a handgun when he entered the car, the jury, as instructed (CALCRIM No. 226), was not obligated to believe her. No other testimony suggested that anyone, including Macias, knew that defendant entered the car with a handgun.

*Third*, even if she knew that he was bringing a handgun back to the park, that evidence does not compel the conclusion that, as a matter of law, death was a natural and probable consequence of the contemplated assault. (*Nguyen*, *supra*, 21 Cal.App.4th at p. 531 ["[t]he determination [of] whether a particular criminal act was a natural and probable consequence of another criminal act . . . is a factual question to be resolved by the jury"].)

D. <u>Defendant's claim that the trial court erred in failing to instruct the jury on the natural and probable consequences doctrine as to accomplice liability for murder</u>

To the extent defendant argues that the trial court erred in failing to instruct the jury on the natural and probable consequences doctrine as to accomplice liability for murder, that contention fails. Aside from the fact that it is insufficiently argued on appeal (see, e.g., *People v. Williams* (1997) 16 Cal.4th 153, 206), it lacks substantive merit. Our Supreme Court has clarified that a trial court does not have a sua sponte duty to

16

instruct on the natural and probable consequences doctrine of accomplice culpability, and about target and nontarget offenses, unless the prosecution relies on that doctrine to prove the defendant's guilt or the defense requests the instructions. (*People v. Avila, supra*, 38 Cal.4th at pp. 568–569; *People v. Prettyman, supra*, 14 Cal.4th at pp. 269–270; see also *People v. Gonzalez* (2002) 99 Cal.App.4th 475, 484–485.) Here, defendant does not direct us to any evidence in the appellate record that the prosecution either relied upon this theory or that he requested this instruction below.

E. <u>Defendant's constitutional rights were not violated</u>

Defendant claims that not instructing that Macias was an accomplice as a matter of law violated his constitutional rights. Not so. As set forth above, there was no error—Macias was not an accomplice as a matter of law. It follows that there was no attendant federal constitutional error.

Even assuming instructional error occurred, it did not rise to the level of federal constitutional error. It is well-settled that "[e]rror in failing to instruct the jury on consideration of accomplice testimony at the guilt phase of a trial constitutes state-law error, and a reviewing court must evaluate whether it is reasonably probable that such error affected the verdict." (*People v. Williams* (2010) 49 Cal.4th 405, 456.) Although section 1111 provides that a conviction cannot be sustained upon the testimony of an accomplice unless it is corroborated, "the use of accomplice testimony is not catalogued with constitutional restrictions." (*United States v. Augenblick* (1969) 393 U.S. 348, 352–353.)

Defendant further claims that failing to give CALCRIM No. 335 as to Macias (and only giving CALCRIM No. 334)

17

violated his federal due process by relieving the prosecution from proving the elements of the offenses charged.  We disagree.  The prosecution was not alleviated from proving any element of the charged offense beyond a reasonable doubt.

"California law permits placing the burden to prove the accomplice status of a witness on a defendant.  [Citation.]  This is because whether a witness is an accomplice is collateral to the defendant's guilt or innocence.  [Citation.]  It is an issue that need not be established to prove an element of the defendant's crime.  [Citation.]  CALCRIM No. 334's instruction that a defendant must prove, by a preponderance of the evidence, a witness's status as an accomplice thus, in general, correctly states the law.  [Citation.]"  (*People v. Martinez* (2019) 34 Cal.App.5th 721, 729.)

Defendant's comparison of this case to *Yates v. Evatt* (1991) 500 U.S. 391, overruled on other grounds in *Estelle v. McGuire* (1991) 502 U.S. 62, 72, is unavailing.  "*Yates* involved misinstruction on the element of malice in a murder case.  The jury was erroneously instructed that the requisite element of malice could be established based on either of two mandatory presumptions:  that "'use of a deadly weapon'" establishes malice, and that the "'willful, deliberate, and intentional doing of an unlawful act'" operates in the same way.  [Citation.]  Both 'mandatory presumptions' were unconstitutional [because they tended to shift the burden of proof on malice from the prosecution to the defendant], as conceded by respondents in *Yates*. [Citation.]"  (*People v. Harris* (1994) 9 Cal.4th 407, 425.)  That did not occur here.  The instructions given did not shift the burden of proof on the elements of the charged offenses from the

18

prosecution to defendant. (*Waddington v. Sarausad* (2009) 555 U.S. 179, 190–191.)

Finally, defendant's Sixth and Fourteenth Amendment rights were not violated. Those amendments guarantee a defendant's right to present a complete defense. (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1258.) Defendant was not denied that right at trial.

F. <u>Any error was harmless</u>

Even if the trial court had erred by not instructing that Macias was an accomplice as a matter of law, that alleged error was harmless under any standard. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.) The erroneous decision to instruct with CALCRIM No. 334 rather than CALCRIM No. 335 "is harmless if the record contains 'sufficient corroborating evidence.' [Citation.] Corroborating evidence may be slight, entirely circumstantial, and entitled to little consideration when standing alone. [Citations.] It need not be sufficient to establish every element of the charged offense or to establish the precise facts to which the accomplice testified. [Citations.] It is 'sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.' [Citation.]" (*People v. Valdez*, *supra*, 55 Cal.4th at pp. 147–148.)

Macias's testimony was corroborated by Jones. Days after the shooting, Jones identified defendant as the shooter in a photographic lineup. Jones was immediately certain when he made his identification and pointed out defendant's photograph. Although Jones identified Lard as the shooter at the preliminary hearing, when he was asked to look at the counsel table with both Lard and defendant present, he also identified defendant as the

19

shooter at trial. This evidence was far more than the "slight" evidence needed to corroborate Macias's testimony. (See *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1178 [accomplice testimony was corroborated where defendant's gang membership established motive for defendant to participate in the murder and another witness testified that he "believed" that defendant was in front of the victim's apartment at the time the victim was murdered].) Indeed, Jones's identification of defendant as the shooter was sufficient by itself to convict. (*People v. Brown* (2014) 59 Cal.4th 86, 106 ["unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction"].) Moreover, as in *Samaniego*, defendant's status as a Mac Mafia member, which was established by an independent gang expert, also connected him to this Mac Mafia-related crime.

Furthermore, the testimony of Rice, Lebeau, and Gilmore, which Jones corroborated, provided very strong evidence of defendant's guilt such that there is little probability that Macias's status as an accomplice made a difference. As set forth above, each key witness of the shooting described defendant as the shooter and described his actions in the same manner. It follows that there is no reasonable probability of a more favorable result had the jury been instructed that Macias was an accomplice rather than might have been an accomplice.

Defendant complains that by singling out Macias with a different instruction, the trial court signaled that she was the one telling the truth. This argument fails to account for the fact that the other witnesses, just like Macias, also unequivocally identified defendant as the shooter. Accordingly, if the jury

20

believed those witnesses rather than Macias, it would still have found defendant guilty.

In any event, the trial court did not completely fail to instruct that Macias might have been an accomplice, and therefore an unreliable witness. Rather, the trial court instructed that the jury had to decide whether Macias was an accomplice, and, if so, then it was to view her testimony, which needed to be independently corroborated, with caution. Other instructions comprehensively guided the jury's assessment of Macias's, and other witnesses', testimony. (*People v. Carrington* (2009) 47 Cal.4th 145, 192 ["'[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' [Citation.]"]) The jury presumptively followed the trial court's instructions to determine whether Macias was an accomplice and, if so, to view her testimony cautiously and not to return a guilty verdict without corroboration. (See *People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17 ["The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions"].) Accordingly, the full context of the given instructions obliterated any alleged prejudice. (See *People v. Lewis* (2001) 26 Cal.4th 334, 371 [the absence of an accomplice instruction may be deemed nonprejudicial where the jury is otherwise instructed on factors to consider in determining whether a witness is credible].)

21

II. *Alleged error in failing to stay defendant's sentence on count 2*

Defendant argues that the concurrent sentence imposed on count 2 (possession of a firearm by a felon) should have been stayed pursuant to section 654 because it was part of an indivisible course of conduct to murder Lacy.

A. <u>Relevant law and standard of review</u>

Section 654, subdivision (a), provides, in relevant part: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) "At its simplest, 'section 654 proscribes double punishment for multiple violations of the Penal Code based on the "same act or omission."'" (*People v. Atencio* (2012) 208 Cal.App.4th 1239, 1243 (*Atencio*).)

"Section 654 therefore '"precludes multiple punishment for a single act or for a course of conduct comprising indivisible acts."'" (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143 (*Jones*).) The intent and objective of the actor determines whether a course of criminal conduct is divisible. If all of the offenses were incidental to, or were the means of accomplishing one objective, then the defendant harbored a single intent and can be punished only once. However, if the defendant had multiple or simultaneous objectives, he may be punished for each violation even though the violations may share common acts or were part of an otherwise indivisible course of conduct. (*Ibid.*)

"Whether section 654 applies to the facts in a given case is one of fact for the trial court to decide, and such findings will be upheld on appeal if there is any substantial evidence to support them." (*Atencio*, *supra*, 208 Cal.App.4th at p. 1242.) We review

the trial court's findings in the light most favorable to the judgment and presume in support of the sentencing order the existence of every fact the jury could reasonably deduce from the evidence. (*Id*. at p. 1243.) "'[T]he power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions from those of the trial court.'" (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1378.)

    B. <u>Analysis</u>

    Here, defendant was convicted of being a felon in possession of a firearm in addition to murder. Whether a felon in possession of a firearm offense "'"constitutes a divisible transaction from the offense in which [the defendant] employs the weapon depends upon the facts and circumstances of each individual case."'" (*Jones, supra,* 103 Cal.App.4th at p. 1143.) "[S]ection 654 is inapplicable when the evidence shows that the defendant arrived at the scene of his or her primary crime already in possession of the firearm." (*Id*. at p. 1145.) When the evidence "demonstrates at most that fortuitous circumstances put the firearm in the defendant's hand only at the instant of committing another offense, section 654 will bar a separate punishment for the possession of the weapon by an ex-felon.'" (*People v. Garcia* (2008) 167 Cal.App.4th 1550, 1565.) Such circumstances occur when a defendant shoots an officer with a gun he took from that officer moments before (*People v. Bradford* (1976) 17 Cal.3d 8, 13, 22–23) or when the shooting follows a struggle with the victim over a gun produced by that victim

23

(*People v. Venegas* (1970) 10 Cal.App.3d 814, 818–821). (See *People v. Vang* (2010) 184 Cal.App.4th 912, 916 (*Vang*).)[11] When, however, the defendant already has a weapon and then uses it to commit "another separate and distinct transaction undertaken with an additional intent which necessarily is something more than the mere intent to possess the proscribed weapon," section 654 does not apply. (*People v. Ratcliff* (1990) 223 Cal.App.3d 1401, 1414 (*Ratcliff*).)

Here, the evidence showed that defendant was already in possession of his firearm before he confronted Lacy at the park and shot him. Because no fortuitous circumstances placed the firearm in defendant's hands at the moment when Lacy was killed, section 654 is inapplicable. (*Jones*, *supra*, 103 Cal.App.4th at p. 1145 ["[S]ection 654 is inapplicable when the evidence shows that the defendant arrived at the scene of his or her primary crime already in possession of the firearm"].) "That [defendant] did not possess the weapon for a lengthy period before commission of the primary crime is not determinative." (*Jones*, *supra*, at pp. 1147–1148.)

Urging us to reverse, defendant relies upon *People v. Kane* (1985) 165 Cal.App.3d 480 (*Kane*). In that case, the People conceded that the defendant could not be punished for both possession of a firearm by a convicted felon and shooting at an occupied vehicle under section 654. (*Kane, supra,* at p. 488.) The *Kane* court agreed, observing that the defendant "possessed the firearm, fired it at [the victim] and hit the [vehicle] in an

---

[11] As noted in *People v. Washington* (2021) 61 Cal.App.5th 776, 791, "*Vang* is no longer good law," but for a different reason than it is cited for here.

24

indivisible course of conduct." (*Ibid*.)  The *Kane* court's acceptance of the People's concession does not support defendant's contentions on the facts before us.

Furthermore, *Kane* has been criticized.  (See *Ratcliff*, *supra*, 223 Cal.App.3d at p. 1412 [*Kane* "failed to address the issue of prior or subsequent possession of the weapon or, in our view, reached the wrong result on the facts"].)  *Ratcliff* and *Jones* concurred that, apart from *Kane*, case law has established that possession of a firearm by an ex-felon is subject to section 654 only where the defendant had fortuitously come into possession of the firearm at the very moment of commission of an offense in which he used the firearm.  If, on the other hand, the defendant possessed the firearm before he used it to commit another crime, the antecedent possession is a separate, and separately punishable, offense.  (*Ratcliff*, *supra*, 223 Cal.App.3d at pp. 1410–1414; *Jones*, *supra*, 103 Cal.App.4th at pp. 1142–1149.)

We agree with the analysis of *Ratcliff* and *Jones*.  Just as in those two cases, substantial evidence shows that defendant "arrived at the scene of his . . . primary crime already in possession of the firearm."  (*Jones*, *supra*, 103 Cal.App.4th at p. 1145.)  Defendant was armed when he approached Lacy, pointed his handgun, and fired.  There is no evidence suggesting that the handgun came into defendant's possession only at the instant that he discharged it.  As defendant's possession of the handgun was "antecedent to and separate from" the shooting, we conclude that section 654 does not bar the imposition of multiple punishments in this case.  (*Id*. at p. 1147.)

25

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
ASHMANN-GERST


We concur:


_____, P. J.
LUI


_____, J.
CHAVEZ